## Case No. 3,230.

### CORFIELD v. CORYELL.

[4 Wash. C. C. 371.][1]

Circuit Court, E. D. Pennsylvania. April Term, 1823.

CONSTITUTIONAL LAW—REGULATION OF COMMERCE—STATE BOUNDARIES—DELAWARE BAY—STATE REGULATION OF FISHERIES—ADMIRALTY JURISDICTION.

1. Explanation of the eighth section of the first article of the constitution of the United States, granting to congress power to regulate commerce; of the second section of the fourth article, as to the privileges and immunities of citizens of one state in every other state; of the second section of the third article, extending the judicial power of the United States to all cases of admiralty and maritime jurisdiction.

[Cited in Atkinson v. Philadelphia & T. R. Co., Case No. 615; U. S. v. New Bedford Bridge, Id. 15,867; The Passenger Cases, 7 How. (48 U. S.) 556; Gilman v. Philadelphia, 3 Wall. (70 U. S.) 725; The Clinton Bridge, Case No. 2,900; U. S. v. Hall, Id. 15,282; U. S. v. Anthony, Case No. 14,459; McCready v. Com., 94 U. S. 395; U. S. v. Petersburg Judges of Election, Case No. 16,036; Hall v. De Cuir, 95 U. S. 513; Williams v. Bruffy, 96 U. S. 183; Ex parte Kinney, Case No. 7,825; The Civil Rights Cases, 109 U. S. 47, 3 Sup. Ct. 47; Butchers' Union, etc., Co. v. Crescent City, etc., Co., 111 U. S. 764, 4 Sup. Ct. 658; People v. Marx, 99 N. Y. 386; Ex parte Chin King, 35 Fed. 356; Marvin v. Maysville St. R. & T. Co., 49 Fed. 437. Quoted in the Slaughter-House Cases, 16 Wall. (83 U. S.) 75, 97, 116, 117, 127.]

2. The oyster law of New Jersey of the 9th of June 1820, is not repugnant to any of the provisions of the constitution of the United States.

[Approved in Bennett v. Boggs, Case No. 1,319. Cited in brief in Smith v. Maryland, 18 How. (59 U. S.) 75; McCready v. Com., 94 U. S. 395.]

3. What are the boundaries of New Jersey on the Delaware bay and river under the grants of Charles II. to the Duke of York, and the grant of Charles II. to the proprietaries of Pennsylvania; and what are those boundaries in consequence of the Revolution, and the treaty of peace.

[Cited in Bennett v. Boggs, Case No. 1,319; Case of the Pea Patch Island, Id. 10,872.]

4. What are the boundaries of Cumberland county in New Jersey, on the Delaware bay.

[Cited in Manchester v. Com., 139 U. S. 262, 11 Sup. Ct. 564.]

5. To enable a plaintiff to maintain trespass or trover for an injury to personal property, the plaintiff must have had, at the time the injury was done, either actual or constructive possession of the thing, as well as a general or constructive property therein.

6. The power of a state to regulate the fisheries within its territorial limits, as to its own citizens and the citizens of other states.

7. Jurisdiction of courts of admiralty as to misdemeanors committed on the seas.

[Cited in U. S. v. New Bedford Bridge, Case No. 15,867; Waring v. Clarke, 5 How. (46 U. S.) 481.]

---

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

This was an action of trespass for seizing, taking and carrying away, and converting to the defendant's use, a certain vessel, the property of the plaintiff, called the Hiram. Plea not guilty, with leave to justify.

The case, as proved at the trial, was as follows: The plaintiff purchased the Hiram from one De Silver, in February 1819, and obtained a bill of sale of her, which, with her coasting license, was on board at the time of the alleged trespass. The plaintiff hired the Hiram to one Hand, but for how long a time, or upon what terms, did not appear. Hand hired her to John Keene for $10 a month, but he expected to keep her during the season. John Keene, being thus possessed of this vessel, left Philadelphia with one Courtney, on board, to assist him in navigating her, and in taking oysters. On the 15th of May 1821 she was conducted to the oyster beds in Maurice river cove, New Jersey, where Keene and Courtney engaged in raking and collecting oysters by means of a dredge, and were found so employed on that day by a New Jersey vessel called the Independence, having on board forty or fifty persons, amongst whom were some of the magistrates and constables of Cumberland county, and the collector of the port. There were on board the Independence a few fire-arms and a small unmounted swivel. When the Independence neared the Hiram, the latter was ordered to come to, which order being complied with, she was boarded by three or four of the persons from the Independence, amongst whom was the defendant, who acted in the character of prize master, and conducted the Hiram to Leesburg, a small town up Maurice river, where she was secured and put under a guard. The next day process was served upon Courtney (Keene having escaped under an apprehension of being sued by a person living at Leesburg, to whom he was indebted), who appeared before a court assembled for the occasion at Leesburg, consisting of two magistrates. After an examination of witnesses, and of the papers of the Hiram, she was, with her tackle, &c. condemned, and ordered to be sold. This sentence was afterwards carried into execution, by a sale of the vessel for the price of $10.

From the point of Cape May to that opposite Egg island, there is a deep indentation or curve, which, or a part of which, is called Maurice river cove or bay. The distance from one of these points to the other is about twenty-two miles. Maurice river falls into this cove about ten miles upon a straight line from Egg island to Elder point, the upper point of Maurice river. Dividing creek lies about midway between the mouth of Maurice river and Egg is'and. The plaintiff's witnesses stated that when the Hiram was seized, she was five or six miles above, or north of the mouth of Maurice river, and from two to three miles south by east from Dividing creek and from the land, in about

four feet water at low tide. Sometimes there is not more than two feet water at or about that place, but it is never bare. That the flat ground extends about five miles out from the shore; the oyster beds about four miles.

It was stated by the defendant's witnesses, one of whom had made a particular survey of about seventeen miles of the coast of this cove, that the flats extend five or six miles out from Maurice river before the cove deepens, but that the whole cove is flat and shallow; at low tide the water on the flats being from three to three and a half feet; and that the tide in general rises six feet; the depth of the cove, that is, a line from a cord of the cove from Cape May point to Egg island, extended to the shore, would be about fourteen miles, and that from the shore over to the Delaware shore is about forty miles; the main oyster bed lies about four and a half miles from the mouth of Maurice river. That when the Hiram was taken she was dredging about one, or one and a quarter miles from the east point of Maurice river, on about two feet water, and within a straight line extended from that point to Egg island, and also within an outer bed of oysters, which is sometimes bare at low water. One witness stated that he had seen persons wade out from Maurice river half a mile to some oyster beds, and another, that below the mouth of that river he had waded out two miles. It was further stated by one of the defendant's witnesses, that the whole coast of the cove is a losing one; that it has lost considerably in twenty years, and that he had heard from others that it had lost at least half a mile in the last fifty years.

The defendant justified under an act of assembly of the state of New Jersey, passed on the 9th of June 1820, which forbids any person to rake on any oyster bed in that state, or to gather any oysters or shells on any banks or beds within the same, from and after the 1st of May until the 1st of September, in every year, under a certain pecuniary penalty, to be recovered by action of debt. The second section declares "that if any person residing in or without this state shall, at any time hereafter, rake for or gather oysters in any of the rivers, bays, or waters of this state, with a dredge, or implement so called, or shall be on board of any canoe, boat or vessel employed in raking with such implement, such person so offending shall forfeit and pay the sum of $50, to be recovered," &c. The third section makes it the duty of every magistrate, upon his own view, or the information of others upon oath, to issue his warrant to an officer of his county, commanding him to raise a force to assist him, if necessary, in apprehending every person offending against either of the above sections, in any of the bays, rivers, or waters of that state, and to carry them before the said magistrate. The fifth section prohibits any person from gathering oysters in any of the rivers, bays or

waters of the state, for the purpose of burning them for lime. The sixth section, which is the material one in this case, declares "that it shall not be lawful for any person who is not at the time an actual inhabitant and resident in this state. to rake or gather clams, oysters, or shells, in any of the rivers, bays, or waters in this state, on board of any canoe, flat, scow, boat, or other vessel, not wholly owned by some person, inhabitant of, and actually residing in this state; and every person offending herein, shall forfeit and pay $10, to be recovered, &c.; and shall also forfeit the canoe, flat, &c. employed in the commission of such offense, with all the clams, oysters, shells, rakes, tongs, tackle, furniture and apparel in and belonging to the same." The seventh section makes it the duty of all sheriffs and constables, and permits any other person, to seize and secure any such canoe, flat, &c. and immediately to give information thereof to two justices of the peace of the county where such seizure shall have been made, who are required to meet at such time and place as they should appoint for the trial thereof, and to hear and determine the same, and in case the same should be condemned, it should be sold by and under the order and direction of the said justice, who, after deducting the cost and charges, should pay one half the proceeds to the collector of the county in which such offence was committed, and the other half to the persons who seized and prosecuted the same.

The proceedings before the two justices of Cumberland county, sitting at Leesburg, in Maurice river township, were in due form, and conformable to the above act. The information states the seizure of the Hiram to have been made in the cove of Maurice river, in the county of Cumberland, in the waters of New Jersey, which said vessel was used and employed in the said offence of raking and gathering oysters, in the said cove, the said vessel not being wholly owned by any person an inhabitant of, or actually residing in the said state; on board of which vessel one                , who is not at this time an actual inhabitant and resident of New Jersey, was engaged on the 15th of May in the business and occupation of raking and gathering oysters, in the said cove of Maurice river. The information then prays sentence of condemnation, sale, and distribution of the proceeds agreeably to the above act.

A notice, signed by the two magistrates, stating the time and place of trial, together with the information, was regularly served upon Courtney, who appeared before the justices. Then follows a regular sentence of condemnation and order of sale, reciting the evidence to prove the offence, &c.

The defendant offered in evidence the record of an indictment in the court of oyer and terminer, in the state of New Jersey, attested by the clerk of the court, under the seal of the court, but not authenticated by the presiding judge as required by the act of congress. This evidence was objected to, and the following cases were cited: Pet. C. C. 352 [Craig v. Brown, Case No. 3,328]; [Ferguson v. Harwood] 7 Cranch [11 U. S.] 408; [Drummond v. Magruder] 9 Cranch [13 U. S.] 122. It was contended, on the other side, that although this record wants the certificate of the presiding judge that the attestation is in due form, and it is not on that account conclusive evidence; it is nevertheless good prima facie evidence at common law, and as such ought to be received. Baker v. Field, 2 Yeates, 532; Pet. C. C. 74 [Green v. Sarmiento, Case No. 5,760]; Field v. Gibbs [Case No. 4,766.]

Charles J. Ingersoll and J. R. Ingersoll, for plaintiff.

M'Ilwaine & Condy, for defendant.

WASHINGTON, Circuit Justice. We know of no such distinction as conclusive and prima facie record evidence; the one under the act of congress, and the other at common law. Unless the record be authenticated in the manner prescribed by the act of congress, it cannot be read in evidence, for any purpose whatever.

The counsel for the plaintiff contended:

1. That the right of fishing in the bed of the public waters of the state is common to all the citizens of the state, and cannot be restrained, as it is by this act. Arnold v. Mundy, Hals. [6 N. J. Law] 68. Agreeably to this decision, it is unimportant how far the Hiram was found raking for oysters, since it is agreed she was below low water mark. In the case of Peck v. Lockwood [5 Day, 22] it was decided that the right of fishing on the land of another, where the sea or arm of the sea flows and ebbs, is a right common to all the citizens. 5 Barn. & Ald. 266.

2. Maurice river cove, as it is called, is in fact Delaware bay, an arm of the sea, over which, to low water mark, the state of Delaware has at least concurrent jurisdiction, and consequently the citizens of that state cannot be excluded by the state of New Jersey from the free use and enjoyment of any part of the beds or waters of the bay below low water mark. Besides, this use of the oyster beds has been common property ever since the settlement of the state, and it is now too late for New Jersey to assert an exclusive right to them. Vatt. 127. 2 Smith's Laws, 77

3. The territorial jurisdiction of New Jersey is bounded by the Delaware bay and river, or in other words, by the low water mark, by the terms of the grants by Charles II. to his brother the Duke of York, dated the 12th of March 1663–64, and by the duke to Lord Berkeley and Sir George Carteret, bearing date the 24th of June 1664. That the whole of the bay and river was granted to

William Penn by the Duke of York, by the two grants of the 24th of August 1682. The grants by the Duke of York do not include bays, except on the eastern section of the state, afterwards called East Jersey.

4. The act ought not to be so construed as to apply to oyster beds in the waters of the state, below low water mark, inasmuch as it would expose the legislature to the charge of an attempt to usurp a jurisdiction beyond the territorial limits of the state. Besides, the expressions in the sixth section, waters "in this state," varying the phrase "of the state," as used in the second section, where only a pecuniary penalty was imposed, strongly support this construction. Now, if it could be granted that Maurice river cove, below low water mark, belonged to New Jersey, still it cannot be said to be a water in the state; or rather, the change of the phrase from ·"of" to "in," shows that the law was cautiously worded, so as by the sixth section to exclude all waters from its operation but rivers and creeks running into the body of the state. But at all events, it is impossible to include any part of Maurice river cove below low water mark within the body of Cumberland county; the admiralty jurisdiction below that mark ·being exclusive, Bevan's Case, and the notes, 3 Wheat. [16 U. S.] 371; [Handly v. Anthony] 5 Wheat. [18 U. S.] 379; 2 Brown, Civ. & Adm. Law, 465, 475; Hall, Pr. 19.

5. The sixth section of this act is contrary to the second section of the fourth article of the constitution of the United ·States, by denying to the citizens of other states, rights and privileges enjoyed by those of New Jersey. It is also contrary to that part of the constitution which vests in congress the power to regulate trade and commerce between the states, and also to the second section of the third article, which extends the judicial authority to all cases of admiralty and maritime jurisdiction, the whole of which is assumed by the act of the 15th of May 1820. This.was completely a maritime proceeding in form, as well as in substance, and was in fact an act of robbery or piracy.

Besides all these objections, the proceedings before the justices were contrary to the fourth article of the amendments to the constitution; the seizure having been · made without a warrant granted on oath or affirmation.

On the part of the defendants, it was insisted:

1. That this being an action of trespass for seizing the plaintiff's vessel, it cannot be supported without showing an actual or constructive possession in the plaintiff at the time the trespass was committed, and also a general or qualified property in the thing, and a right in the owner to immediate possession. In this case, the plaintiff was the absolute owner, but Keene had the qualified property and the actual possession, which the plaintiff was not entitled to claim, the

vessel having been hired to Keene for ten dollars a month. 1 Chit. Pl. 166, 67. So as to trover. 1 Chit. Pl. 150; 8 Johns. 435; 7 Johns. 9; 4 Term R. 489; 11 Johns. 385; 15 East, 607; 7 Johns. 535..

Upon the merits: It was insisted, that New Jersey is a sovereign state, and entitled to all the rights and prerogatives of a sovereign, except such as are ceded by the constitution. As a sovereign state, her territorial jurisdiction on. the Delaware river extended to the middle of the river, and on the sea, to at least a marine league. · This being her right to the waters adjacent to her coast, it includes all the fisheries to the same extent. That these fisheries are the common property of the citizens of that state, may be admitted; but clearly the state may regulate and control the exercise of this right for the common benefit; and the jurisdiction of the state over them is unquestionable. Mart. 157, 160, 162, 165, 168; Vattel, bk. 1, c. 22, §§ 276, 278, 266; Id. c. 20, §§ 234, 236, 246, 248, 253; Id. bk. 1, c. 23, §§ 287, 295, 205; Grotius, bk. 2, c. 2, § 5. As to the right of citizens of other states to this common property, were cited, U. S. v. Bevan, 3 Wheat. [16 U. S.] 386; Livingston v. Van Ingen, 9 Johns. 507; Ogden v. Gibbons, 4 Johns. Ch. 157.

The act in question of 1820 is but a re-enactment of similar laws passed in 1719, and in 1798, (Pat. Laws, 262.)

The place where this offence was committed was within the body of the county of Cumberland. Harg. Law Tracts; Rev. Laws, 19, 245. See, also, Owens, 122; 4 Inst. 137; Harg. Law Tracts, 47, 88.

As to the second section of the fourth article of the constitution, it applies only to the privileges and immunities of citizenship, not to rights in the common property of the state. 9 Johns. 521, 560; 3 Har. & McH. 12; Serg. Const. Law, 385; 2 Munf. 393.

As to the alleged boundaries of New Jersey on the Delaware, Chalmers' Opinion of Eminent Lawyers, page 59, was referred to, where it is laid down, that the river Delaware belonged to the crown. If the bay was not granted by the Duke of York to Lord Berkeley and Sir George Curtis, then it remained in the grantor, and became vested in him as king, upon his accession to the crown, and by the Revolution, one half, or at least to the extent of a league from the coast, became vested in New Jersey.

The plaintiff's counsel, in answer to the objection to the remedy, cited 5 Com. Dig. "Trespass;" 6 Bac. 565, "Trespass C." They further contended that, as the hiring of the Hiram to Hand, and by him to Keene, was by parol, the act of congress rendered the change of property invalid.

WASHINGTON, Circuit Justice, after stating to the jury the great importance of many of the questions involved in this cause, recommended to them to find for the plaintiff, and assess the damages; subject

to the opinion of the court upon the law argument of the facts in the cause. Verdict for $560, subject, &c..

This case was argued, on the points of law agreed by the counsel to arise on the facts, at the October term 1824, and was taken under advisement until April term 1825, when the following opinion was delivered:

WASHINGTON, Circuit Justice. The points reserved present for the consideration of the court, many interesting and difficult questions, which will be examined in the shape of objections made by the plaintiff's counsel to the seizure of the Hiram, and the proceedings of the magistrates of Cumberland county, upon whose sentence the defendant rests his justification of the alleged trespass. These objections are,—

First. That the act of the legislature of New Jersey of the 9th of June 1820, under which this vessel, found engaged in taking oysters in Maurice river cove by means of dredges, was seized, condemned, and sold, is repugnant to the constitution of the United States in the following particulars: 1. To the eighth section of the first article, which grants to congress the power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes. 2. To the second section of the fourth article, which declares, that the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states. 3. To the second section of the third article, which declares, that the judicial power of the United States should extend to all cases of admiralty and maritime jurisdiction.

In case the act should be considered as not being exposed to these constitutional objections, it is then insisted,

Secondly. That the locus in quo was not within the territorial limits of New Jersey. But if it was, then

Thirdly. It was not within the jurisdiction of the magistrates of Cumberland county.

Fourthly. We have to consider the objection made by the defendant's counsel to the form of this action.

The first section of the act of New Jersey declares, that, from and after the 1st of May, till the 1st of September in every year, no person shall rake on any oyster bed in this state, or gather any oysters on any banks or beds within the same, under a penalty of $10. Second section: No person residing in, or out of this state, shall, at any time, dredge for oysters in any of the rivers, bays, or waters of the state, under the penalty of $50. The third section prescribes the manner of proceeding, in cases of violations of the preceding sections. The two next sections have nothing to do with the present case. The sixth section enacts, that it shall not be lawful for any person,

who is not, at the time, an actual inhabitant and resident of this state, to gather oysters in any of the rivers, bays, or waters in this state, on board of any vessel, not wholly owned by some person, inhabitant of, or actually residing in this state; and every person so offending, shall forfeit $10, and shall also forfeit the vessel employed in the commission of such offence, with all the oysters, rakes, &c. belonging to the same. The seventh section provides, that it shall be lawful for any person to seize and secure such vessel, and to give information to two justices of the county where such seizure shall be made, who are required to meet for the trial of the said case, and to determine the same; and in case of condemnation, to order the said vessel, &c. to be sold.

The first question then is, whether this act, or either section of it, is repugnant to the power granted to congress to regulate commerce? Commerce with foreign nations, and among the several states, can mean nothing more than intercourse with those nations, and among those states, for purposes of trade, be the object of the trade what it may; and this intercourse must include all the means by which it can be carried on, whether by the free navigation of the waters of the several states, or by a passage over land through the states, where such passage becomes necessary to the commercial intercourse between the states. It is this intercourse which congress is invested with the power of regulating, and with which no state has a right to interfere. But this power, which comprehends the use of, and passage over the navigable waters of the several states, does by no means impair the right of the state government to legislate upon all subjects of internal police within their territorial limits, which is not forbidden by the constitution of the United States, even although such legislation may indirectly and remotely affect commerce, provided it do not interfere with the regulations of congress upon the same subject. Such are inspection, quarantine, and health laws; laws regulating the internal commerce of the state; laws establishing and regulating turnpike roads, ferries, canals, and the like.

In the case of Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1, which we consider as full authority for the principles above stated, it is said, "that no direct power over these objects is granted to congress, and consequently they remain subject to state legislation. If the legislative power of the Union can reach them, it must be for national purposes; it must be when the power is expressly given for a specified purpose, or is clearly incident to some power which is expressly given." But if the power which congress possesses to regulate commerce does not interfere with that of the state to regulate its internal trade, although the latter may remotely affect external commerce, except

where the laws of the state may conflict with those of the general government; much less can that power impair the right of the state governments to legislate, in such manner as in their wisdom may seem best, over the public property of the state, and to regulate the use of the same, where such regulations do not interfere with the free navigation of the waters of the state, for purposes of commercial intercourse, nor with the trade within the state, which the laws of the United States permit to be carried on. The grant to congress to regulate commerce on the navigable waters belonging to the several states, renders those waters the public property of the United States, for all the purposes of navigation and commercial intercourse; subject only to congressional regulation. But this grant contains no cession, either express or implied, of territory, or of public or private property. The jus privatum which a state has in the soil covered by its waters, is totally distinct from the jus publicum with which it is clothed. The former, such as fisheries of all descriptions, remains common to all the citizens of the state to which it belongs, to be used by them according to their necessities, or according to the laws which regulate their use. "Over these," says Vattel (book 1, c. 20, §§ 235, 246), "sovereignty gives a right to the nation to make laws regulating the manner in which the common goods are to be used." "He may make such regulations respecting hunting and fishing, as to seasons, as he may think proper, prohibiting the use of certain nets and other destructive methods." Vattel, bk. 1, c. 20, § 248. The jus publicum consists in the right of all persons to use the navigable waters of the state for commerce, trade, and intercourse; subject, by the constitution of the United States, to the exclusive regulation of congress. If then the fisheries and oyster beds within the territorial limits of a state are the common property of the citizens of that state, and were not ceded to the United States by the power granted to congress to regulate commerce, it is difficult to perceive how a law of the state regulating the use of this common property, under such penalties and forfeitures as the state legislature may think proper to prescribe, can be said to interfere with the power so granted. The act under consideration forbids the taking of oysters by any persons, whether citizens or not, at unseasonable times, and with destructive instruments; and for breaches of the law, prescribes penalties in some cases, and forfeitures in others. But the free use of the waters of the state for purposes of navigation and commercial intercourse, is interdicted to no person; nor is the slightest restraint imposed upon any to buy and sell, or in any manner to trade within the limits of the state.

It was insisted by the plaintiff's counsel, that, as oysters constituted an article of trade, a law which abridges the right of the citizens of other states to take them, except in particular vessels, amounts to a regulation of the external commerce of the state. But it is a manifest mistake to denominate that a commercial regulation which merely regulates the common property of the citizens of the state, by forbidding it to be taken at improper seasons, or with destructive instruments. The law does not inhibit the buying and selling of oysters after they are lawfully gathered, and have become articles of trade; but it forbids the removal of them from the beds in which they grow, (in which situation they cannot be considered articles of trade,) unless under the regulations which the law prescribes. What are the state inspection laws, but internal restraints upon the buying and selling of certain articles of trade? And yet, the chief justice, speaking of those laws [Gibbons v. Ogden] 9 Wheat. [22 U. S.] 203, observes, that "their object is to improve the quality of articles produced by the labour of a country; to fit them for exportation, or, it may be, for domestic use. They act upon the subject before it becomes an article of foreign commerce, or of commerce among the states, and prepare it for that purpose." Is this not precisely the nature of those laws which prescribe the seasons when, and the manner in which, the taking of oysters is permitted? Paving stones, sand, and many other things, are as clearly articles of trade as oysters; but can it be contended, that the laws of a state, which treat as tort feasors those who shall take them away without the permission of the owner of them, are commercial regulations? We deem it superfluous to pursue this subject further, and close it by stating our opinion to be, that no part of the act under consideration amounts to a regulation of commerce, within the meaning of the eighth section of the first article of the constitution.

2. The next question is, whether this act infringes that section of the constitution which declares that "the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states?" The inquiry is, what are the privileges and immunities of citizens in the several states? We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are, it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind,

and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole. The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the state; may be mentioned as some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental: to which may be added, the elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised. These, and many others which might be mentioned, are, strictly speaking, privileges and immunities, and the enjoyment of them by the citizens of each state, in every other state, was manifestly calculated (to use the expressions of the preamble of the corresponding provision in the old articles of confederation) "the better to secure and perpetuate mutual friendship and intercourse among the people of the different states of the Union." But we cannot accede to the proposition which was insisted on by the counsel, that, under this provision of the constitution, the citizens of the several states are permitted to participate in all the rights which belong exclusively to the citizens of any other particular state, merely upon the ground that they are enjoyed by those citizens; much less, that in regulating the use of the common property of the citizens of such state, the legislature is bound to extend to the citizens of all the other states the same advantages as are secured to their own citizens. A several fishery, either as the right to it respects running fish, or such as are stationary, such as oysters, clams, and the like, is as much the property of the individual to whom it belongs, as dry land, or land covered by water; and is equally protected by the laws of the state against the aggressions of others, whether citizens or strangers. Where those private rights do not exist to the exclusion of the common right, that of fishing belongs to all the citizens or subjects of the state. It is the property of all; to be enjoyed by them in subordination to the laws which regulate its use. They may be considered as tenants in common of this property; and they are so exclusively entitled to the use of it, that it cannot be enjoyed by others without the tacit consent, or the express permission of the sovereign who has the power to regulate its use.

This power in the legislature of New Jersey to exclude the citizens of the other states from a participation in the right of taking oysters within the waters of that state, was denied by the plaintiff's counsel, upon principles of public law, independent of the provision of the constitution which we are considering, upon the ground, that they are incapable of being appropriated until they are caught. This argument is unsupported, we think, by authority. Rutherfoth, bk. 1, c. 5, §§ 4, 5, who quotes Grotius as his authority, lays it down, that, although wild beasts, birds, and fishes, which have not been caught, have never in fact been appropriated, so as to separate them from the common stock to which all men are equally entitled, yet where the exclusive right in the water and soil which a person has occasion to use in taking them is vested in others, no other persons can claim the liberty of hunting, fishing, or fowling, on lands, or waters, which are so appropriated. "The sovereign," says Grotius (book 2, c. 2, § 5), "who has dominion over the land, or waters, in which the fish are, may prohibit foreigners (by which expression we understand him to mean others than subjects or citizens of the state) from taking them." That this exclusive right of taking oysters in the waters of New Jersey has never been ceded by that state, in express terms, to the United States, is admitted by the counsel for the plaintiff; and having shown, as we think we have, that this right is a right of property, vested either in certain individuals, or in the state, for the use of the citizens thereof, it would, in our opinion, be going quite too far to construe the grant of privileges and immunities of citizens, as amounting to a grant of a co-tenancy in the common property of the state, to the citizens of all the other states. Such a construction would, in many instances, be productive of the most serious public inconvenience and injury, particularly, in regard to those kinds of fish, which, by being exposed to too general use, may be exhausted. The oyster beds belonging to a state may be abundantly sufficient for the use of the citizens of that state, but might be totally exhausted and destroyed if the legislature could not so regulate the use of them as to exclude the citizens of the other states from taking them, except under such limitations and restrictions as the laws may prescribe.

3. It is lastly objected, that this act violates that part of the constitution which extends the judicial power of the United States to all cases of admiralty and maritime jurisdiction. The taking of oysters out of season, and with destructive instruments, such as dredges, is said to be an offence against the ancient ordinances and statutes of the admiralty, and that it is punishable by the admiralty as a misdemeanour. The authority relied upon to establish this doctrine is one of Sir L. Jenkins' charges, to be found in 2 Brown, Civ. & Adm. Law, 475. The amount of the argument is, that, since offences of this kind are cases of admiralty and mari-

time jurisdiction, the laws of a state upon the same subject, vesting in the state tr.bunals jurisdiction over them, are repugnant to this grant of jurisdiction to the judiciary of the United States. This argument, we think, cannot be maintained. For although the various misdemeanours enumerated by Sir L. Jenkins in his charges, may have been considered as admiralty offences at that period, either under the common law, or the ancient ordinances and statutes of the admiralty, it remains yet to be shown that they became such, and were cognizable by the judiciary of the United States, independent of some act of the national legislature to render them so. Many of those offences are already incorporated into the Criminal Code of the United States, and no person, it is presumed, will question the power of congress, by further legislation, to include many other offences to which the jurisdiction of the admiralty in England extended at the period above alluded to. But it is by no means to be conceded that, because offences of the nature we are now considering may rightfully belong to the jurisdiction of the English admiralty, the power of that government to regulate her fisheries being unquestionable, congress has a like power to declare similar acts, or any acts at all, done by individuals in relation to the fisheries within the limits of the respective states, offences against the United States. There are doubtless acts which may be done upon the navigable waters of a state which the government of the United States, and that of the state, have a concurrent power to prohibit, and to punish as offences; such for example as throwing ballast into them, or in any other way impeding the free use and navigation of such rivers. But we hold that the power to regulate the fisheries belonging to the several states, and to punish those who should transgress those regulations, was exclusively vested in the states, respectively, at the time when the present constitution was adopted, and that it was not surrendered to the United States, by the mere grant of admiralty and maritime jurisdiction to the judicial branch of the government. Indeed, this power in the states to regulate the fisheries in their navigable rivers and waters, was not, in direct terms, questioned by the plaintiff's counsel; and yet their argument upon this point, when followed out to its necessary consequences, amounts to a denial of that power.

As to the ancient criminal jurisdiction of the admiralty in cases of misdemeanours generally, committed on the sea, or on waters out of the body of any county; we have very respectable authority for believing that it was not exercised, even if it existed, at the period when the constitution of the United States was formed, and, if so, it would seem to follow that, to the exercise of jurisdiction over such offences, some act of the national legislature to punish them as offences against the United States is necessary. We find from the opinions of learned and eminent counsel who were consulted on the subject, that misdemeanours committed upon the sea had never been construed as being embraced by the statute of 28 Hen. VIII. c. 15, and that the criminal jurisdiction of the admiralty, except as excised under that statute, had become obsolete, so that, without an act of parliament, they could not be prosecuted at all. 2 Brown, Civ. & Adm. Law, Append. 519–521. If then it could be admitted that congress might legislate upon the subject of fisheries within the limits of the several states, upon the ground of the admiralty and maritime jurisdiction, it would seem to be a conclusive answer to the whole of the argument on this point, that no such legislation has taken place; and consequently the power of the state governments to pass laws to regulate the fisheries within their respective limits remains as it stood before the constitution was adopted.

Secondly. The next general question to be considered is, whether the boundaries of the state of New Jersey include the place where the Hiram was seized whilst engaged in dredging for oysters? The grant from Charles II. to his brother, the Duke of York, of the territory of which the present state of New Jersey was a part, dated the 12th of March 1663–4, was of all that territory lying between the rivers St. Croix adjoining Nova Scotia, and extending along the sea coast southerly to the east side of Delaware bay, together with all islands, soils, rivers, harbours, marshes, waters, lakes, fishings, huntings and fowlings, and all other royalties, profits, commodities, hereditaments and appurtenances to the same belonging and appertaining, with full power to govern the same. The grant of the Duke of York dated the 24th of June 1664, to Lord Berkeley, and Sir George Carteret, after reciting the above grant, conveys to them all that tract of land lying to the westward of Long Island and Manhattan's Island, bounded on the east, part by the main sea, and part by Hudson's river, "and hath upon the west Deaware bay or river, and extendeth southward," &c. with all rivers, fishings, and all other royalties to the said premises belonging, &c. There is no material difference between these grants as to the boundaries of New Jersey on the westward; and we are of opinion that, although the rule of the law of nations is, that where a nation takes possession of a country separated by a river from another nation, and it does not appear which had the prior possession of the river, they shall each extend to the middle of it; yet that when the claim to the country is founded, not on discovery and occupancy, but on grant, the boundary on the river must depend upon the just construction of the grant, and the intention of the parties to be discovered from its face. Taking this as the rule, we think the

claim of New Jersey under these grants to any part of the bay or river Delaware below low water mark cannot be maintained. The principle here suggested is, we conceive, fully recognized and adopted by the supreme court in the case of Handly's Lessee v. Anthony, 5 Wheat. [18 U. S.] 374. Neither do we conceive that the limits of the state can, by construction, be enlarged in virtue of the grant of all rivers, fishings, and other royalties; which expressions ought, we think, to be confined to rivers, fishings and royalties within the boundaries of the granted premises. This appears to have been the opinion of the crown lawyers, who were consulted more than a century ago respecting the boundaries of New Jersey and Pennsylvania, and this too after hearing counsel upon the question. Their opinion was, that the right to the river Delaware, and the islands therein, still remained in the crown. See Chalmers' Opinions. Notwithstanding this objection to the title of New Jersey, whilst a proprietary government, to any part of the bay and river Delaware, it seems that the proprietaries of West Jersey claimed, if not the whole of the river, a part of it at least below low water mark, as far back as the year 1683, as appears by a resolution of the assembly of that province in that year, "that the proprietary of the province of Pennsylvania should be treated with in reference to the rights and privileges of this province to, or in the river Delaware." By certain concessions of the proprietaries, free holders, and inhabitants of west New Jersey, some time about the year 1767, they granted that all the inhabitants of the province should have liberty of fishing in Delaware river, or on the sea coast. In 1693 a law passed in that province which enacted that all persons not residing within that province, or within the province of Pennsylvania, who should kill, or bring on shore, any whale in Delaware bay, or elsewhere within the boundaries of that government, should be liable to a certain penalty. In the year 1771 another act was passed for improving the navigation of the Delaware river, and in 1783 another act was passed which annexed all islands, islets, and dry land in the river Delaware belonging to the state, as low down as the state of Delaware, to such counties as they lay nearest to. And in the same year, the compact was made between the states of New Jersey and Pennsylvania, by which the legislatures of the respective states were authorized to pass laws for regulating and guarding the fisheries in the river Delaware, annexed to their respective shores, and providing that each state should exercise a concurrent jurisdiction on the said river. These acts prove, beyond a doubt, that the proprietaries of west New Jersey, from a very early period, asserted a right to the river Delaware, or to some part thereof, below low water mark, and along its whole length; and since the western boundary of the province, under the grant to

the Duke of York, was precisely the same on the bay as on the river, it may fairly be presumed, independent of his grant to the proprietaries in 1680, and the concessions made by them in the year 1676, that this claim was extended to the bay, for the purposes of navigation, fishing, and fowling.

In this state of things the Revolution was commenced, and conducted to a successful issue; when his Britannic majesty, by the treaty of peace, acknowledged the several states to be sovereign and independent, and relinquished all claims, not only to the government, but to the propriety and territorial right of the same. The right of the crown to the bay and river Delaware being thus extinguished, it would seem to follow, that the right claimed by New Jersey in those waters, was thereby confirmed; unless a better title to the same should be found to exist in some other states. Whether the claim of New Jersey extended to the middle of the bay, as we see by the compact with Pennsylvania it did to the middle of the river, is a question which we have no means of solving: but that the proprietors and inhabitants of west New Jersey made use of the bay, both for navigation and fishing, under a claim of title, from a period nearly coeval with the grants of the province, can hardly admit of a doubt. This right, indeed, is expressly granted by the Duke of York to William Penn, and the other proprietaries of west New Jersey by his grant, bearing date the 6th of August 1680. It contains a grant, not only of all bays and rivers to the granted premises belonging, but also the free use of all bays and rivers leading into, or lying between the granted premises, for navigation, fishing, or otherwise. The only objection which could have been opposed to the exercise of those acts of ownership under this grant was, that the duke had himself no title to the bay and river Delaware, under the royal grant to him. But the presumption is, nevertheless, irresistible, that the benefits intended to be bestowed by this grant, and which were confirmed by the other acts of the provincial government before noticed, were considered by the inhabitants of the province as being too valuable not to be enjoyed by them. This use of the bay and river amounted to an appropriation of the water so used (Vattel, bk. 1, c. 22, § 266); and this title became, as has before been observed, indefeasible, by the treaty of peace, except as against some other state having an equally good, or a better title. How far this title in New Jersey may be affected by the grants of the Duke of York to William Penn in 1682, of the tract of country which now forms the state of Delaware, it would be improper, in this case to decide. But that the use of the bay for navigation and fishing was claimed and enjoyed by the inhabitants of that province under those grants, is as fairly to be presumed, as that it was so claimed, and used by the inhabitants of New Jersey.

And we are strongly inclined to think that, if the right of the former of these states to the bay of Delaware, was founded on no other title than that of appropriation, by having used it for purposes of navigation and fishing, the effect of the Revolution, and of the treaty of peace, was to extend the limits of those states to the middle of the bay, from its mouth upwards. But be the title of the state of Delaware what it may, we are clearly of opinion, that, as between the plaintiff, who asserts, and has certainly shown, no conflicting title in the state of Delaware to the bay, and the state of New Jersey, or those acting under the sanction of her laws, the court is bound to consider that law as a sufficient justification of the proceedings under it, provided the locus in quo was within the body of the county of Cumberland, which is next to be considered.

Thirdly. The third general question then, is, whether admitting the locus in quo to be within the territorial limits of New Jersey, it is within the limits of the county of Cumberland, in which the proceedings complained of took place? The boundaries of this county towards the bay are thus described in the act which created it: "Then bounded by Cape May county to Delaware bay, and then up Delaware bay to the place of beginning." If the opinion of the court upon the last preceding question as to the construction of the original grant from Charles II. to the Duke of York be correct, it would seem to follow that the western boundary of this county extends only to low water mark on Delaware bay; the expressions "to Delaware bay," implying nothing more than to the east side of that bay, which the law extends to low water mark. We mean not, however, to give any decided opinion on this point, because, in the first place, if there be any weight in the above suggestion, (and nothing more is intended,) the legislature of that state can, at any time, should it be deemed necessary, define with greater precision the limits of the county bordering on the bay; and secondly, because we think it unnecessary to decide that point in the present case; being clearly of opinion,

Fourthly. That the objections to this form of action are fatal. It is an action of trespass, brought by the owner of the Hiram, for illegally seizing, taking, and carrying away the said vessel. It appears by the evidence, that, at the time of the alleged trespass, the vessel was in the possession of John Keene, in virtue of a hiring of her to him for a month, by Hand, who had previously hired her of the plaintiff, and that the time for which Keene had hired her, had not expired when the seizure was made. The question is, can the plaintiff, under these circumstances, maintain this action? We hold the law to be clearly settled, that, to enable a person to maintain trespass, or trover, for an injury done to a personal chattel, the plaintiff must have had, at the time the injury was done, either actual, or constructive possession of the thing; as well as the general or qualified property therein. The merely being out of the actual possession is not sufficient to defeat the action, provided he has a right to demand it, because the general property, prima facie, draws to it the possession. But, if the general owner part with the possession to another person, under a contract which entitles such person to an interest in the thing, though for a limited time, the owner cannot be considered as having a constructive possession during that time, and consequently, he cannot maintain an action of trespass for an injury done to it during such possession of the bailee. His only remedy is an action on the case for consequential damages. See 1 Chit. Pl. 166, 167, 150, and the cases there cited. Also, 8 Johns. 337; 7 Johns. 9, 535; 11 Johns. 385. The Hiram then, having been lawfully in possession of Keene, under a contract of hiring for a month, which had not expired at the time the alleged trespass was committed, the action cannot be supported.

Let judgment be entered for the defendant.