JUDGE LINDSAY
delivered the opinion oe the court.
Marshall sued Donovan and Daum for the forcible seizure and conversion of a cow of the value of sixty dollars. They answered, and stated that Daum was the sheriff of Bracken County, that Donovan was his deputy, and that they seized and sold the cow to satisfy a tax-claim against Marshall arising out of a levy made pursuant to the provisions of an act of the General Assembly, approved March 11, 1873, entitled “An act for the benefit of the common schools in Bracken County.”
The first section of said act provides “ that in any common-school district in Bracken County in which the clearly ascertained will of the people shall be in favor of a district tax for the purpose of purchasing a site for a district school-house, of building a new school-house, of repairing an old one, or *684 furnishing a school-house, or paying a debt that has been contracted for the purposes mentioned in this act, the levying of such a tax therein shall be lawful.”
The second section provides that the will of the people, in any given district, shall be ascertained by the submission of the proposition to tax to “the white qualified voters thereof; . . . . and any widow or alien residing in any school-district who is a tax-payer, or who has children, within the ages fixed by the common-school laws, to be educated, shall be deemed a qualified voter.”
The ninth section is in these words: “ This act shall not apply to property owned by citizens of African descent.”
The answer set out in detail the performance of every act essential under the law to authorize the imposition of the tax, and also the regularity of the steps taken by the sheriff and his deputy to enforce its collection.
Appellant filed a general demurrer to this answer; it was overruled; and the record shows that he admitted all the facts interposed by way of defense by standing by his demurrer, and that the court then dismissed his petition. He appeals, and insists that the act of March 11, 1873, is unconstitutional and void.
1. Because by the common-school laws of this commonwealth the negro is deprived “ of his right to and interest in the school-funds of the state under the eleventh article of the state constitution.”
2. Because the election provided for by the act is not “ free and equal.”
3. Because the property of citizens of African descent is not taxed as that of other citizens.
4. Because the state denies to persons within its jurisdiction the equal protection of the laws.
5. Because the act denies to citizens of African descent the right to vote on a question which concerns them as citizens, *685 and thus violates the fifteenth amendment to the constitution of the United States.
We will not take up these propositions separately, preferring, as they are intimately connected the one with each and all the others, to treat them as subdivisions of the general proposition that the constitution of Kentucky has been so far modified by the adoption of the thirteenth, fourteenth, and fifteenth articles of amendment to the Federal constitution as to deprive the legislature of the power to maintain a system of common schools, under which moneys may be raised by the taxation of the property of the white inhabitants, and expended for the exclusive benefit of the white children of the commonwealth. If this proposition can be maintained, it results that our system of common schools as now organized is without constitutional sanction, and that the taxation annually levied and collected for school-purposes is so levied and collected without authority of law.
The eleventh article of the state constitution declares that certain enumerated funds, together with any sum that may be “ raised in the state by taxation or otherwise for the purposes of education, shall be held inviolate for the purpose of sustaining a system of common schools. The interest and dividends of said funds, together with any sum which may be produced for that purpose by taxation or otherwise, may be appropriated in aid of common schools, but for no other purpose.”
The Revised Statutes embody the first legislation on the subject of common schools after the adoption of our present constitution. They provide that the auditor shall each year apportion the revenue arising from the school-fund “among the several counties of the state according to the number of free white children in each between the ages of six and eighteen years, as shown by the returns of the assessors in his office.” (Section 1, article 1, chapter 88.)
*686 By section 1 of article 8 of the same chapter the legislature declared that its object was “to carry into effect the intention of the people of Kentucky, as expressed in their constitution, 'in promoting the establishment throughout the state of a system of common schools which shall be equally accessible to the poor as to the rich; ” and it further declared “ that every school which is put under the control of - trustees and commissioners pursuant thereto, which has been actually kept three months during the year by a qualified teacher, and at which every free white child in the district between the ages of six and eighteen years has had the privilege of attending, whether contributing toward defraying the expenses or not, and none other, shall be deemed a common school within the meaning of this chapter, or entitled to contribution out of the school-fund.”
This contemporaneous legislative construction of this article of the constitution has been followed in all subsequent legislation (Session Acts, 1864, Myers’s Supplement, p. 439 ; General Statutes, p. 236), and has been accepted as correct by all the departments of the state government.
When the proposition to increase the school-tax fifteen cents upon each one hundred dollars’ worth of taxable property was submitted to the voters of the state for ratification, the act provided that the annual tax should “be levied and collected only upon the property of white persons,” and be “ expended for the education of white children exclusively.” This act was approved on the 22d day of January, 1869, after the thirteenth and fourteenth articles of amendment to the Federal constitution had been declared adopted.
Prior to December 18, 1865, when it was officially announced that the thirteenth article had become part of the constitution of the United States, the negro population in Kentucky was generally in a state of slavery. The free negroes were not citizens of the state. They were mere resi *687 dents without political rights. (Articles 7, 8, 9, chapter 93, Revised Statutes; article 10, State Constitution; Amy v. Smith, 1 Littell, 326.)
They were not citizens of the United States, and were not capable of becoming citizens thereof. (Naturalization Acts, April 14, 1802; March 26,' 1804; May 22, 1824; May 24, 1828.) It was held, in the celebrated Dred Scott case, by the Supreme Court of the United States that a man of African descent, whether a slave or not, was not and could not be a citizen of the state or of the United States; and, notwithstanding the criticism to which this adjudication was subjected, it was never overruled; and the primary object of the fourteenth amendment was to relieve this race from the disabilities therein declared to be inherent in and inseparable from the African blood. (16 Wallace, 73.)
The thirteenth amendment abolished slavery, and prohibited involuntary servitude except as a punishment for crime, but it left the negro under all his former political disabilities, and with no political rights except such as the various states might see proper to permit him to enjoy.
We thus find that up to the 20th of July, 1868, when the fourteenth amendment was officially promulgated, our common-school system as organized and maintained was in perfect accord with the provisions of our state constitution, and with the expressed intentions of those who framed it, and in no wise repugnant to any provision of the Federal constitution.
The inquiry now arises, did the adoption of this amendment have the effect of repealing or rendering void and inoperative the laws under which our said system 'of common schools was organized, and under which they were being maintained at the time ? If it did have that effect, then it is clear that the system was destroyed utterly on the day of its adoption, and that no steps could thereafter be legally taken *688 to carry out the provisions of the eleventh article of our state constitution until the legislature should reorganize the system and make it conform to the amended Federal constitution.
The first section of the amendment under consideration embraces all the provisions that can have any application to the questions before us for adjudication. It defines first who are citizens of the United States and of the several states, and then declares that “no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.”
The main purpose of the first clause of this section was to establish the citizenship of a race of people who had not theretofore been citizens of the states or of the United States. (16 Wallace, 73.)
There is nothing in the section from which it can be inferred that any of the existing rights, privileges, immunities, or advantages secured by law, and by the state and Federal constitutions before the adoption of the amendment, to persons who were already citizens were to be destroyed, modified, or in the slightest degree abridged. The primary object of the amendment was to elevate the negro to a political status he had not theretofore occupied, but it was not intended to affect to any extent the existing status of the white race.
We need not inquire critically as to the rights intended to be conferred upon the negro as a citizen of the United States. Whatever interest he may claim in the school-fund of Kentucky, if any, and whatever benefits he may be entitled to under our system of common schools, he must receive as a citizen of this commonwealth, and not as a citizen of the United States.
These interests and benefits are privileges and immunities *689 pertaining to the citizenship of the state owning the school-fund and maintaining the school-system, and they must be secured and protected by the state government. They do not fall within that class of fundamental rights which, according to the opinion of the Supreme Court in the Slaughter-house cases, are under the special care of the Federal government. These fundamental rights have not as yet been accurately defined by the judicial tribunals of the country; but, so far as they are secured by the first subsection of section 2 of article 4 of the Federal constitution, they have been held to be such as “protection by the government, the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole” (Corfield v. Coryell, 4 Wash. C. C. Rep. 371); the right of free access to the seat of the Federal government and to its seaports; the right to the care and protection of that government over life, liberty, and property when on the high seas; the right to peaceably assemble and petition for redress of grievances; the privileges of the writ of habeas corpus; the right to use the navigable waters of the United States, however they' may penetrate the territory of' the several states; and all rights secured to our citizens by treaties with foreign nations. (16 Wallace, 79.)
In the first civil-rights bill passed by Congress after the adoption of the thirteenth amendment, and on account of doubts as to its constitutionality re-enacted after the official promulgation of the fourteenth amendment, these fundamental privileges and immunities were declared to include the right “to make and enforce contracts; to sue; be parties and give evidence; to inherit, purchase, lease, sell, hold, and convey real estate and personal property; and to full and equal benefit of all laws for the security of person and property.” The *690 accuracy of this declaration, is still an open question. It has not as yet been authoritatively passed upon, although it receives the indirect indorsement of Mr. Justice Field in his dissenting opinion in the Slaughter-house cases.
The recent amended civil-rights bill, the constitutionality of which has not as,yet been passed upon by any judicial tribunal, state or Federal, multiplies these privileges and immunities to the utmost extent that can possibly be sustained under the most latitudinous construction of the powers of the Federal government. Yet none of these definitions or enumerations, judicial or congressional, embrace the right of a citizen, white or black, to share the school-fund and participate in the advantages of the common-school system of a state.
From all this it seems to us that there can be no doubt that such right and privileges “ lay within the constitutional and legislative power of the states, and without that of the Federal government.”
The power of the states to establish and maintain systems of common schools, to raise money for that purpo.se by taxation, and to govern, control, and regulate such schools when established, is one of “the powers not delegated to the United States by the constitution, nor prohibited by it to the states,” and consequently it is reserved to the states respectively or to their people.
This conclusion brings up the question whether our common-school system and the laws by and through which it is supported, governed, and regulated are violative of our state constitution? The eleventh article of that instrument not only creates a fund to be held inviolate for the purpose of being used in aid of common schools, and for no other purpose, but expressly recognizes the power of the General Assembly to raise money by taxation for the same purpose.
But appellant insists that the negro now being a citizen of Kentucky, possessing all the- constitutional privileges of any *691 other citizen, has a right to demand an equal participation in the profits arising from the school-fund and in the educational advantagés afforded by the common-school system. We need not determine the correctness of this proposition. It is sufficient that in this case the negro is asserting no such claim, and that the appellant, who belongs to the favored race or class, can not raise the question as to the constitutionality of the manner in which the school-fund and the moneys raised by taxation for school-purposes are expended or distributed.
The courts will not listen to an objection made to the constitutionality of an act by a party whose rights it does not affect, and who has therefore no interest in defeating it. (Cooley on Constitutional Limitations, 164.)
That taxation may be constitutionally imposed to raise money for common - school purposes is undoubted. The manner in which the money when raised is expended may result in securing to appellant advantages which he can not rightfully demand, but the mode of disbursement can not possibly affect his rights injuriously. As therefore he is constitutionally taxed, and as he receives his full share of the benefits and advantages accruing from the school-system, he can not be heard to complain that the legislative power as exercised in the expenditure of the school-fund is unwarranted. He does not occupy an attitude authorizing him to ask the courts to assume the grave responsibility of declaring unconstitutional and void the system of laws by and through which one of the most important of our public interests is maintained and regulated. (Sinclair v. Jackson, 8 Cowen, 543; Smith v. McCarthy, 56 Penn. 359; Antoni v. Wright, 22 Grat. 857.)
It is further objected that by the general laws upon the subject of common schools, and by the provisions of the local act under which the sheriff was proceeding in this case, the property owned by persons of African descent is not taxed. As a general proposition, taxation to be constitutional must be *692 as nearly as practicable equal and uniform. To this general rule, however, there are well-recognized exceptions. Where all are alike benefited by the taxation the burden should .be a common one; but where the benefits are special and peculiar the contributions may be so laid as to exempt from taxation those persons who are by the law itself excluded from all participation in the advantages which are expected to arise from the system, institution, or improvement to the establishment, construction, or maintenance of which the money when raised is to be appropriated. It is under this principle of discrimination that assessments for the opening, making, improving, or repairing of streets, the drainage of swamps, the construction of canals and railways, and like works of local public utility are made to depend to some extent upon the supposed benefits which the local community or the adjacent property will receive.
The legislatui'e has the constitutional power to establish a municipal corporation, to define its boundaries, and to delegate to it the power to impose and collect taxes for the support of the municipal government; but this local taxation can not be imposed upon persons or property receiving no benefits whatever from that government. (City of Covington v. Southgate, 15 B. Mon. 498; Cheany v. Hooser, 9 B. Mon. 350.)
It does not matter that the property is situated nor that the person resides within the corporate limits of the municipality. The taxation can not be imposed where there are no benefits, upon the ground that it would amount to the taking of private property for public use without compensation. But it does not result from this that the act of incorporation is void, nor that persons and property receiving benefits therefrom can escape the payment of taxes because so much of the act as attempts to. tax persons or property not benefited is unconstitutional. So it is under the school-laws of this state, and under the local act specially applying to the county of Bracken.
*693 Appellant receives, or may receive, his full share of the benefits and advantages accruing under these laws, and for that reason his property may be taxed to support the school-system of the state, and also for the purposes contemplated by the local act having special application to the county of Bracken. It is no defense to him that other persons who can and do receive none of the benefits are exempted from the same character of taxation.
If the negroes were taxed and the money expended for the exclusive benefit of the whites, the taxation would be flagrantly unjust, palpably wrong, and clearly unconstitutional. In such a state of case the negro might successfully resist the collection of the tax; but it would no more follow from that fact that the school-laws are unconstitutional as to the whites than that an act incorporating a city or town is altogether void because it attempts to extend the power of municipal taxation over persons and property receiving no benefit or advantage from the municipal government, and is to that extent violative of the fundamental law.
. Whatever may be the duty the state owes to the negro in regard to providing for the education of his children, it is one that devolves upon the legislature, and in the discharge of that duty that department of the government has the power, by imposing taxes upon his property and by establishing schools for the benefit of his children, to equalize the burdens and benefits of the two races, so far as the matter of education is concerned.
Since this litigation began the initiatory step has been taken in that direction, and the property of the negro is now taxed just as that of the white man, and all revenue derived from the taxation imposed upon the person or property of the negro, together with all fines, penalties, and forfeitures incurred by that race of people, are set apart and devoted to the establishment and maintenance of a system of common *694 schools for the benefit of the colored children of the commonwealth. (Session Acts, February 24,1874.)
This act can not of course affect the law of this case, but it illustrates the fact that it is for the legislature and not for the courts to determine the time, and the manner in which the imperfections in our school-system, growing out of the change in the civil and political condition of the negro, are to be remedied.
The last objection to the act of March 11, 1873, is that it denies to the negro the right to vote, and confers that right upon any widow or alien resident in the school-district who is a tax-payer, or who has children, within the ages fixed by the common-school laws, to be educated. The ascertainment of the will of the people of a district in relation to a tax proposed to be levied for any or all the purposes of. the act is not an election. It is but the action of the agency selected by the legislature to determine when and to what extent the conditional statute shall become operative in that particular district.
“ The law being- made known, may be universally observed and obeyed. It may be carried into operation by the executive alone. It may be enforced by the judiciary, or by the co-operation of the judiciary and the executive. These are the regular agencies provided by the constitution for the execution of the laws. But the legislature is not restricted to these agencies. It may select or appoint others, as is often done,'when the object of the law is to accomplish local or individual purposes. The agencies generally employed for applying the'legislative will and the power of-the government to purposes merely local have been that of county courts for counties, and the trustees of .towns, or the municipal authorities of cities, for towns and cities, which, to the extent of the powers permanently or temporarily vested in them, or whether allowed a discretion or not, do but carry into effect the legis *695 lative will and power. But these local agencies are selected and some of them created by the legislature itself, for the purpose of carrying its powers into all parts of the commonwealth, or into such parts as require its application for their benefit or coercion; and the legislature may seleet other agencies for particular purposes, having in view, as it must be presumed to have, the nature of the object to be accomplished and the fitness of the agency selected.” (Slack v. M. & L. R. R. Co., 13 B. Mon. 22, 23.)
“It is no objection to the constitutionality of such statutes that they depend for their final effect upon the discretionary acts of individuals or others.” (Ibid. 25.)
In this case the final effect,of the local statute depends upon the discretionary act of all the persons who are to be affected by it. It consults the will of each and every person who can receive its benefits, or upon whom its burdens ■ may be imposed. It excludes from participation in the discretionary act only those in no wise interested in the operations of the law, or in the purpose intended to be accomplished by it.
The fitness of the agency selected and the propriety of the mode adopted to ascertain the will of that portion of the local community to be taxed and benefited can not but be conceded upon the mere statement of the provisions of the act.
We are of opinion that the answer of appellees presented a good defense to appellant’s action, and that his petition was properly dismissed.
Judgment affirmed.