**Alfred AVINS, Plaintiff,**

v.

**John B. HANNUM, Clarence R. Moll, Widener College, Inc. and Delaware Law School of Widener College, Inc., Defendants.**

**Civ. A. No. 79–89.**

United States District Court,
E. D. Pennsylvania.

Aug. 21, 1980.

Alfred Avins, pro se.

Franklin Poul, Judith R. Cohn, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., and John F. Cramp, Cramp, D'Iorio, McConchie & Forbes, Media, Pa., for defendants John B. Hannum, Clarence R. Moll, Widener College, Inc. and Delaware Law School of Widener College, Inc.

Beagan, Gannon & Barnard, Media, Pa., for defendants John B. Hannum, Clarence R. Moll, and Widener College, Inc.

Richard M. Shusterman, White & Williams, Philadelphia, Pa., for defendant Delaware Law School of Widener College, Inc.

## OPINION

BROTMAN, District Judge.[1]

This is an unusual case brought by the founder and former dean of a law school presenting an interesting exercise in the application of the principles of federal jurisdiction worthy of a law school class in civil procedure. The action was instituted by Alfred Avins, Esquire, who founded and served as the first dean of Delaware Law School (DLS),[2] setting forth a diverse collection of claims arising from several events, including the accreditation process for DLS, the affiliation of DLS with Widener College (Widener), the resignation of plaintiff as dean of DLS, and his subsequent dismissal as a tenured professor at DLS.

In his original complaint, plaintiff alleged that jurisdiction is based upon federal questions presented by his claims under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78aa, 28 U.S.C. § 1331, diversity of citizenship, 28 U.S.C. § 1332, and the judicially created doctrine of pendent jurisdiction. On April 23, 1979, the court dismissed with prejudice several counts of plaintiff's complaint, including all of the counts involving the alleged violation of the Securities Exchange Act. On August 3, 1979, the court issued an order granting plaintiff leave to amend his complaint. Plaintiff's amended complaint added seven new claims, including two federal ones, the alleged violation of his rights under the Privileges and Immunities Clause, U.S. Const. Art. IV, § 2, and the alleged violation of the Sherman Act, 15 U.S.C. §§ 1–3.[3]

This matter is now before the court upon the motion of the defendants to dismiss the plaintiff's complaint for lack of subject

---

1. United States District Judge for the District of New Jersey, sitting by designation. 28 U.S.C. § 292(b).

2. Since the affiliation of Delaware Law School with Widener College it has been known as "Delaware Law School of Widener College, Inc." However, for the sake of clarity and consistency it will be referred to as "Delaware Law School" or "DLS" throughout this opinion.

3. Although plaintiff served a copy of his amended complaint upon the defendants, he apparently failed to file a copy of the amended complaint with the United States District Court Clerk, in violation of Fed.R.Civ.P. 5(d). However, since the court received a copy of plaintiff's amended complaint and no party has claimed that it suffered any prejudice as a result of plaintiff's apparent failure to file his amended complaint, the court shall treat the plaintiff's amended complaint as if it had been properly filed.

matter jurisdiction, Fed.R.Civ.P. 12(b)(1), and plaintiff's cross–motion to strike the defendants' defense of lack of jurisdiction.[4]

The court conducted an evidentiary hearing upon these motions on March 11, 1980, at which time it permitted the parties to address the merits of their respective positions, allowed the plaintiff, who is proceeding *pro se*, to testify in a narrative form, and considered the documents which the parties relied upon in support of their contentions. The court also examined the arguments raised by the parties in their subsequent correspondence. After carefully and painstakingly reviewing all of these materials, the court is prepared to rule as follows on the matters now pending before it.

## I. *Diversity Jurisdiction*

■ The first question presented by the cross–motions of the parties is whether there is the requisite diversity of citizenship to sustain the court's exercise of its jurisdiction under 28 U.S.C. § 1332. That provision states in pertinent part:

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—

(1) citizens of different States;

(2) citizens of a State and citizens or subjects of a foreign state;

(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

(4) a foreign state, defined in section 1063(a) of this title, as plaintiff and citizens of a State or different States.

Jurisdiction is asserted in this case under the provision for actions between citizens of different states. In his complaint, plaintiff alleges that he is "a resident and domiciliary" of Washington, D. C.,[5] defendants John B. Hannum and Clarence R. Moll are residents of the State of Pennsylvania,[6] defendant Widener "is a corporation organized and existing under the laws of Pennsylvania," and defendant Delaware Law School "is a Delaware corporation".[7] De-

---

4. Although both sides devoted most of their attention to the issue of the court's subject matter jurisdiction to hear the plaintiff's state law claims, the defendants also questioned the legal sufficiency of plaintiff's new federal claims. Since plaintiff did not object to the current consideration of this issue and directly addressed the question in his correspondence to the court, the court shall also treat defendants' motion as one to dismiss the plaintiff's remaining federal claims.

5. Citizens of the District of Columbia may sue and be sued pursuant to 28 U.S.C. § 1332(d), which provides, "[t]he word 'States,' as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico." The constitutionality of this provision was upheld by the Supreme Court in the case of *National Mutual Insurance Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949).

6. The caption of plaintiff's amended complaint also names F. Eugene Dixon, Jr. as a defendant in this action. However, plaintiff's amended complaint makes no jurisdictional or substantive allegations concerning Dixon. Accordingly, the court shall dismiss Dixon as a defendant in this action, pursuant to Fed.R.Civ.P. 21. *Galda v. Bloustein*, 86 F.R.D. 561 No. 79–2811 (D.N.J.1980). *See* 7 C. Wright & A. Miller,

*Federal Practice and Procedure: Civil* § 1683, at 322–23 (1972).

7. Technically, speaking, plaintiff's jurisdictional statement contains two flaws. First, it alleges that the individual defendants are *residents* of Pennsylvania, while "from the earliest federal cases it has been held that mere residence in a state does not make a person a citizen of that state." 13 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3611 at 701–02 (1975). This rule was not altered by the adoption of the fourteenth amendment. *Robertson v. Cease*, 97 U.S. 646, 24 L.Ed. 1057 (1878). However, the individual defendants have not asserted that they are not also citizens of Pennsylvania, and, as the court stated in *Kelleam v. Maryland Casualty Co.*, 112 F.2d 940, 943 (10th Cir. 1940), *rev'd on other grounds*, 312 U.S. 377, 61 S.Ct. 595, 85 L.Ed. 899 (1941):

The failure to properly allege diversity of citizenship between plaintiff and defendant will not . . . defeat the jurisdiction of the court if, as a matter of fact, such diversity exists. *Halsted v. Buster*, 119 U.S. 341, 7 S.Ct. 276, 30 L.Ed. 462; *Continental L. Ins. Co. v. Rhoads*, 119 U.S. 237, 7 S.Ct. 193, 30 L.Ed. 380; *Howe v. Howe & Owen Ball Bearing Co.*, 8 Cir., 154 F. 820, *Fidler v. Roberts*, 7 Cir., 41 F.2d 305.

fendants have challenged the plaintiff's assertion of District of Columbia citizenship and have claimed that plaintiff was a citizen of the State of Delaware at the relevant time in this matter. If defendants are correct there is incomplete diversity of citizenship, thereby depriving the court of the power to exercise its diversity jurisdiction. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). Before considering the merits of the parties' legal arguments on the question of the plaintiff's citizenship, the court shall briefly recount the factual background from which the issue of citizenship arose.

Plaintiff was born and raised in New York City, where he attended Hunter College (B.A. 1954), Columbia Law School (L.L.B. 1956) and New York University Law School (L.L.M. 1957). He spent the 1957–58 school year in Newark, New Jersey, serving as an instructor at Rutgers University Law School. From 1958 through 1960 plaintiff lived in Washington, D. C. while working for the Federal Power Commission and the National Labor Relations Board. In 1960 he moved to Chicago, Illinois. He studied at the University of Chicago Law School, where he was awarded his M.L. (1962) and J.S.D. degrees (1963). During his stay in Chicago, he served as an assistant professor of law at John Marshall Law School and Chicago Kent College of Law. In 1963 he left Chicago, spending the summer of 1963 in New York City and then leaving for England that fall. He studied for two years at Cambridge University, receiving a Ph.D. in law in June 1965. He then returned to the United States and spent the next two years in Memphis, Tennessee, with the exception of his summers, which were spent in New York City. While in Memphis he served as a professor of law at Memphis State University Law School and briefly sought the Republican party nomination for a seat in the United States Congress. Plaintiff left Memphis in June 1967 to accept a one year appointment as an assistant district attorney in New York City. At the end of his term in 1968, he left the district attorney's office to work in Richard Nixon's presidential campaign in New York and unsuccessfully ran as the Conservative party candidate for a New York state judgeship. Plaintiff remained in New York following the 1968 election while he sought a position with the government and engaged in legal research.

Avins first came to Delaware in 1970 to work in the United States Senate campaign of then Representative William Roth. Although Avins stated that he worked in the Roth campaign because he believed that it would help him to obtain a position with the federal government, he did not leave Delaware after the end of the campaign. Instead he remained in Delaware, gained admission to the Delaware bar and accepted a job as special counsel to the Delaware School Board. In the spring of 1971, he founded Delaware Law School and became its first dean. Plaintiff's activities at Delaware Law School became so extensive and time–consuming that he resigned his position with the Delaware School Board in the spring of 1972 to devote his full time to DLS. Avins served as dean of DLS until September, 1974, when he stepped down from his administrative post while remaining as a tenured member of the faculty. In

---

The second error in plaintiff's jurisdictional allegation is that it does not properly plead the citizenship of the corporate defendants, Widener and DLS. Section 1332(c) provides in pertinent part, "[f]or the purposes of this section . . . a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." In contrast, plaintiff merely alleges that DLS is a Delaware corporation and Widener is a Pennsylvania corporation, without setting forth their respective principal places of business. However, the court notes that defendants have not raised this point in support of their motion to dismiss the instant action for lack of subject matter jurisdiction, presumably because the plaintiff could have alleged that the corporate defendants have their respective principal places of business in the states in which they are incorporated. Although the court could permit the plaintiff to amend his jurisdictional allegations pursuant to 28 U.S.C. § 1653 if it found that diversity of citizenship actually existed, *Carolina Casualty Insurance Company v. Insurance Company of North America*, 595 F.2d 128, 130 n.1 (3rd Cir. 1979), its disposition of the current motions makes such an order unnecessary.

1975 the DLS Board of Trustees voted to affiliate with Widener in a successful attempt to obtain provisional accreditation by the American Bar Association (ABA) before the first DLS class graduated. Avins opposed the decision to affiliate and he participated as an intervenor or plaintiff in several actions in this district and in other jurisdictions challenging the affiliation of DLS with Widener. In June 1977, while still a faculty member at DLS, he became one of the incorporators of District of Columbia Law School, a new law school located in Washington, D. C. Plaintiff did not resign from his teaching post at DLS upon the formation of District of Columbia Law School and only assumed limited responsibilities at the new law school, which only conducted weekend classes. He served as a consultant, member of the board of trustees, and taught one weekend class. Plaintiff remained at DLS until April 20, 1978, when he was dismissed from the faculty. Even after his dismissal from his teaching post, plaintiff remained in Delaware, allegedly for the purpose of working on two cases pending in the United States District Court for the District of Delaware related to the affiliation of DLS and Widener. He arranged to share an apartment in New York City that summer, as he had for several years while living in Delaware. Plaintiff rented an efficiency apartment in Washington, D.C. as of November 1978, although he retained his Delaware apartment through the end of October 1979, well past the January 9, 1979 filing date of plaintiff's complaint in the instant action.

Plaintiff offers two arguments in support of his claim that the court may exercise diversity jurisdiction to hear his complaint. First, plaintiff contends that he was never a citizen of the State of Delaware. Consequently, he could not have been a citizen of that state for diversity purposes at the time he instituted the action. In support of this argument, plaintiff attempts to show that he remained a citizen of the State of New York throughout most or all of the time that he was in Delaware, presumably until he allegedly became a citizen of the District of Columbia. *See* "Guide to Plaintiff's Documents and Exhibits" (Guide), at 1–5; Transcript of March 11, 1980 hearing (Tr.), at 7, 20–22. Second, plaintiff argues that even if the court concludes that he was a citizen of the State of Delaware at the time he filed his complaint, he subsequently changed his state citizenship to either the District of Columbia or the State of New Hampshire and that the court may consider this change of citizenship in determining if diversity jurisdiction exists in this action.[8]

■ Before the court can assess the parties' conflicting claims concerning the plaintiff's citizenship, it must first note the proper reference time for determining a party's citizenship for the purposes of diversity jurisdiction. The cases have clearly established that "[w]hether federal diversity jurisdiction exists is determined by examining the citizenship of the parties at the time the action is commenced." 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3608, at 653 & n.1 (1975 and Supp. 1980). The court shall now review the principles that govern such a determination.

■ First and foremost, because federal courts, unlike most state courts, are courts of limited jurisdiction, they must begin their jurisdictional analysis with a presumption against the existence of federal jurisdiction in any given case. As Professors Wright, Miller and Cooper observe in their treatise:

8. Even though plaintiff alleges in his complaint that he is a "resident and domiciliary" of the District of Columbia, he has also suggested that he is either a domiciliary of the State of New Hampshire or intends to become one. *See* Guide, at 15; Tr., at 23. While plaintiff's decision to relocate to New Hampshire is not *per se* relevant to the question of whether he was a citizen of Washington, D.C. or Delaware at the relevant time in this action, his statement that he intended or intends to relocate to another jurisdiction does tend to cast doubt on his statement that as of December 1978, "I intended at that time and had previously intended to get out of Delaware as soon as I could get rid of the pending case before Judge, Chief Judge Latchum and stay in Washington permanently or at least indefinitely through the building up of the new law school." Tr., at 14–15.

Because of their unusual nature, and because it would not simply be wrong but indeed would be an unconstitutional invasion of the powers reserved to the states if the federal courts were to entertain cases not within their jurisdiction, the rule is well settled that the party seeking to invoke the jurisdiction of a federal court must demonstrate that the case is within the competence of that court. The presumption is that a federal court lacks jurisdiction in a particular case until it has been demonstrated that jurisdiction over the subject matter exists. Thus the facts showing the existence of jurisdiction must be affirmatively alleged in the complaint. If these facts are challenged, the burden is on the party claiming jurisdiction to demonstrate that the court has jurisdiction over the subject matter.

*Id.,* § 3522, at 45–46 (footnotes omitted). Thus, the proponent of federal court jurisdiction bears the burden of persuasion, *Gibbs v. Buck,* 307 U.S. 66, 72, 59 S.Ct. 725, 729, 83 L.Ed. 1111 (1939); *McNutt v. General Motors Acceptance Corporation of Indiana, Inc.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936), and at least the initial burden of producing evidence in support of his claim of federal jurisdiction. *See* 13 C. Wright, A. Miller, & E. Cooper, *supra,* § 3611, at 710–13.

■ Second, in applying the general presumption against the existence of federal jurisdiction, a court may also apply certain corollary principles which either shift the burden of production to the party contesting the court's jurisdiction or may raise the standard of proof which the party asserting jurisdiction must satisfy to establish the proper exercise of federal jurisdiction in a given case.

■ One corollary which may be relevant in this case is the "presumption in favor of an original or former domicile as against an acquired one," *Hamlin v. Holland,* 256 F.Supp. 25, 27 (E.D.Pa.1966); *Herzog v. Herzog,* 333 F.Supp. 477, 478 (W.D.Pa.1971); 13 C. Wright, A. Miller, & E. Cooper, *supra,* § 3612, at 720, or as it is alternatively described, "the presumption that a domicile,

once established, continues until it is changed." 13 C. Wright, A. Miller, & E. Cooper, *supra,* § 3611, at 711. Although some courts inaccurately describe the effect of this presumption as one of shifting the *burden of proof* to the party claiming that the individual in question has changed his citizenship from one state to another, *Kaiser v. Loomis,* 391 F.2d 1007, 1010 (6th Cir. 1968); *Stine v. Moore,* 213 F.2d 446, 447 (5th Cir. 1954), the more precise statement of the impact of this presumption is that it merely shifts the *burden of production* of evidence on the issue of the individual's citizenship, and does not shift the *burden of persuasion,* which remains with the proponent of federal jurisdiction. *Slaughter v. Toye Bros. Yellow Cab Company,* 359 F.2d 954, 955 (5th Cir. 1966). Where the proponent is also the party contending that there has been a change of citizenship of one of the litigants, the effect of the presumption is to raise the standard of proof which that party must bear. 13 C. Wright, A. Miller & E. Cooper, *supra,* § 3612, at 721. The proponent must then prove that there has been a change of citizenship by clear and convincing proof. *Herzog, supra,* at 478.

Having reviewed the principles allocating the burdens of production and persuasion, the court shall now review the definition of "citizenship" for the purpose of determining the existence of diversity jurisdiction and discuss the factors which the court may consider in making such a determination.

■ An individual is considered to be a "citizen" of a given state for the purpose of asserting diversity jurisdiction if he is (1) domiciled within that state; and (2) a citizen of the United States. 13 C. Wright, A. Miller & E. Cooper, *supra,* § 3611, at 697–98. Since there is no dispute as to plaintiff's status as a United States citizen, the court need only address the issue of plaintiff's qualifications under the first prong of this definition of citizenship, namely, whether the plaintiff was a domiciliary of the State of Delaware or the District of Columbia at the time he instituted this action.

The examination of this question should begin with a review of the definition of domicile. One commentator described it as follows:

Although variously expressed, the judicial standard of domicil is essentially equivalent to the lay idea of "home." The first requirement, presenting no problem of proof, is simply some residential connection with the place in question. The second is often defined as an intent to remain at that place with no present intent to remove therefrom, or as the intent to make a home. Since, however, the courts rely most strongly on evidence consisting of the party's acts and tend to minimize direct evidence of intent, it would seem more correct to define the mental element in terms of disposition towards permanence rather than conscious intention. The Supreme Court has adopted this more spontaneous conception, which perhaps may best be expressed in the phrase "attitude of attachment."

Note, *Evidentiary Factors in the Determination of Domicil*, 61 Harv.L.Rev. 1232, 1234 (1948). In applying this definition to determine the domicile of a given individual, the court is to consider "all of the circumstances of the case," 13 C. Wright, A. Miller & E. Cooper, *supra*, § 3612, at 716, including, "current residence, voting registration and voting practices; location of personal and real property; location of brokerage and bank accounts; membership in unions, fraternal organizations, churches, clubs, and other associations, place of employment or business; driver's license and automobile registration; payment of taxes; as well as several others." *Id.*, at 717.[9]

Plaintiff may rely upon some of these factors in support of his claim that he was a New York domiciliary during his stay in Delaware and that he subsequently became a domiciliary of the District of Columbia prior to the institution of this action. First, he points out that while he was in Delaware he also had a shared apartment in New York City, where he kept some of his clothes and personal possessions and where he spent some of his time while he was working in Delaware. Plaintiff also relies upon his New York driver's license, library card, and savings account, as well as his past political involvement in New York, including his unsuccessful candidacy for a New York judgeship. To bolster the second half of his argument, namely, that he abandoned his New York domicile to become a domiciliary of the District of Columbia, Avins mentions his acquisition of an efficiency apartment in Washington, transfer of some of his possessions to that area, acquisition of a Washington driver's license and savings account, transfer of his checking account from Delaware to Washington, retirement from the Delaware bar in 1978, and the termination of his lease on his Wilmington, Delaware apartment in October 1979.

Defendants, in turn, have pointed to many factors supporting their position that plaintiff was a domiciliary of Delaware at the time he was employed by Delaware Law School and that he had not changed his domicile as of the date he filed this action. They refer to the fact that plaintiff lived in Delaware for nine years before filing this action, first in rented rooms, then from 1972 through 1975 in a building on the DLS campus, and from 1975 through October 1979 in a four room apartment in Wilmington, Delaware. They also stress that he kept many personal and business possessions in his Delaware apartment, which he used for both residential and business purposes, spent the vast majority of his time in Delaware since 1970 and did not leave the state soon after he was dismissed from his position at Delaware Law School in 1978. As additional evidence of plaintiff's alleged Delaware domicile, defendants cite his Delaware savings and checking accounts, receipt of most of his mail in Delaware, Delaware driver's license and automobile registration, and renewal of his Delaware driver's license after his acquisition of a Wash-

---

9. For a more exhaustive list of the potentially relevant factors in the determination of an individual's domicile, see Note, *Evidentiary Factors in the Determination of Domicil, supra.*

ington license. Finally, defendants argue that plaintiff's position is inconsistent with the position he took in prior cases arising from the same dispute in which he either claimed or admitted that he was a citizen of the State of Delaware, and where that Delaware citizenship was a basis for invoking the jurisdiction of the courts.

The court has carefully considered the matters raised by the parties and has reached the following conclusions.

■ The evidence clearly indicates that since at least 1972 plaintiff's principal residence was in Delaware, not New York. Both the Delaware Law School building in which he lived from 1972 to 1975 and the four room Wilmington apartment which he occupied from 1975 to October 1979 were larger than either his New York or Washington accommodations. Moreover, although he kept some of his possessions in New York and moved some of his possessions to Washington, the court concludes that the largest portion of these items was to be found in Wilmington, where, by the plaintiff's own admission, he spent a great deal of time. The court may consider the fact that his Wilmington accommodations were more spacious and that more of his belongings were located there in determining his domicile. Note, *Evidentiary Factors in the Determination of Domicil, supra*, at 1235. Another factor reinforcing the primacy of his Delaware residence is that Delaware is the only jurisdiction where the plaintiff continuously had a place to live throughout the time that he was working at Delaware Law School. In comparison, he relinquished his shared New York apartment in 1977, re-renting it again only for the summer of 1978.

The court has considered the fact that District of Columbia Law School has paid the rent on his Washington apartment, as well as the hotel bills for the rooms he rented before he had a Washington apartment, in determining the extent of his commitment to a Washington residence. However, this factor has no evidentiary value since plaintiff did not pay rent when he lived in the Delaware Law School building and did not leave that building until he was requested to do so by the new dean of DLS.

Similarly, the court can derive no guidance as to the plaintiff's domicile from the pattern of mail delivery to him. The delivery of mail to the plaintiff at Wilmington and Washington post office boxes and office addresses and his concomitant decision not to have mail delivered to his residences in Wilmington or Washington may be consistent with any of the competing claims as to the plaintiff's citizenship and may indicate nothing more than the plaintiff's personal predilections for the handling of this esoteric matter. The factual pattern here is simply too ambiguous to detect any hint as to the plaintiff's domicile.

The court has also considered the situs of the plaintiff's economic interests, even though this factor is often outweighed by other matters. *Id.*, at 1236. In this case, plaintiff had economic ties with all three jurisdictions. Although the transfer of the plaintiff's checking account from Delaware to Washington might give some meager support to his claim that he acquired a new domicile in Washington, its significance is undercut by the fact that he apparently retained his Delaware savings account, in addition to his existing New York savings account and his new Washington savings account. Furthermore, the transfer of the checking account from Delaware to Washington does not fully support plaintiff's theory, which is that he was a domiciliary of New York until he became a domiciliary of Washington. If the transfer of the account is taken as evidence of a new Washington domicile, then the prior existence of a Delaware checking account may be considered evidence that he had a Delaware domicile. This, in turn, could support the application of the presumption that his Delaware domicile continued to the time that he filed his complaint on January 9, 1979. Consequently, the court accords little significance to the fact that plaintiff transferred his checking account from Wilmington to Washington or that he had accounts in New York and Washington.

The court has also considered the significance of plaintiff's employment to the determination of his domicile. While the fact that he was dismissed from his position with Delaware Law School and assumed certain responsibilities at District of Columbia Law School does provide some indication of the plaintiff's ties to Washington, the court believes that this is outweighed by plaintiff's ties to Delaware. This determination is based, in part, upon the court's determination that plaintiff was able to assume his responsibilities at District of Columbia Law School while he was still a member of the DLS faculty and while he was spending a significant amount of his time in Delaware. Moreover, plaintiff's connections with the District of Columbia Law School also fail to support the inference that he intended to stay in Washington since he also stated that he intended to leave Washington and move to New Hampshire so he could establish a branch of District of Columbia Law School in Fall River, Massachusetts. In contrast, plaintiff's extensive involvement with Delaware Law School over a seven year period lends more substantial support to the defendants' claim that he was a Delaware domiciliary prior to his dismissal from the DLS faculty, which would provide a basis for the presumption that this domicile continued up to the time he filed this action.

The court also noted that plaintiff has submitted a certificate of retirement from the Delaware bar, thereby signifying that he has surrendered his license to practice law in that state. This factor has only minimal significance since plaintiff's attention is focused upon teaching, not practicing law, and with the exception of his brief tenure with the Delaware School Board, plaintiff has not engaged in the full–time practice of law since 1968.

Another factor examined by the court is the extent of plaintiff's civic involvement in the different communities. *See* Note, *Evidentiary Factors in the Determination of Domicil, supra.* Plaintiff's political activity in New York, where he voted and sought elective office in 1968 and participated in political campaigns in 1968 and 1972, does give some basis for his claim of a New York domicile at the relevant period. However, its importance is largely undercut by the fact plaintiff was politically active in other states during the same general period, seeking elective office in Tennessee in 1966 and working in a political campaign in Delaware in 1970. Furthermore, the court cannot give much weight to the fact that plaintiff voted in New York since the last time he exercised the franchise was in 1968, which was before he had any contact with the State of Delaware. Consequently, it is of little evidentiary value in deciding whether the plaintiff became a Delaware domiciliary sometime in the following decade.

The court has also reviewed a few actions of the plaintiff which might have some weight as formal or informal declarations of his intentions. *Id.*, at 1237–39. These include the plaintiff's acts of obtaining a Delaware driver's license and registering his car in that state, and his subsequent acquisition of a District of Columbia driver's license, which was followed by his decision to renew his Delaware driver's license and to maintain the registration of his car in Delaware. Plaintiff has attempted to explain this unusual course of events by stating that he needed the car in Wilmington, which had poor public transportation, while he did not need it in Washington, which had a better public transportation system. He goes on to reason that he was concerned that his car would be ticketed if it had out of state license plates and was left on the street in Wilmington for an extended period of time. Therefore, he had the car registered in Delaware. He then states that he was concerned that he might be subject to detention by the police if he was stopped while driving a car registered in Delaware when he had a Washington driver's license and felt that the only solution was to renew his Delaware license. Although the court does not think that the plaintiff invented this explanation as a *post hoc* rationalization of his actions, the fact remains that plaintiff was spending a sufficient amount of his time in Delaware to

want to have his only automobile there and that he was willing to register it and renew his driver's license in Delaware to achieve that objective. That presence in the State of Delaware, even if for the purpose of preparing for and trying his claims in his Delaware lawsuits, adds weight to the argument that he had not yet abandoned his alleged domicile in Delaware, even if he intended to leave the state at some time in the future.

This conclusion is reinforced by the statement plaintiff made on January 22, 1979, less than two weeks after he filed the instant complaint, when he registered with the Association of American Law Schools to express his interest in obtaining a position as a visiting professor. Avins stated on the organization's visiting faculty register that his law school affiliation was "Delaware Law School (Emeritus)" and gave both his Wilmington apartment and his Wilmington post office box as his address. This raises serious doubts as to plaintiff's claim that as of December 1, 1978 he had become a domiciliary of the District of Columbia.

After carefully weighing and balancing all of the above mentioned factors and assessing the demeanor of the plaintiff, the court believes that it could fairly conclude that Avins became a domiciliary of the State of Delaware before he was dismissed from the faculty of Delaware Law School, he failed to introduce sufficient evidence to rebut the presumption that he remained a Delaware domiciliary when he instituted this action, and consequently, he has not met his burden of establishing the court's diversity jurisdiction. However, all of the factors discussed above are overshadowed by an even more significant one which clearly indicates that the plaintiff cannot invoke the diversity jurisdiction of the court, namely, his prior declarations that he was a citizen of the State of Delaware in other lawsuits arising from the same dispute as the instant action.

The first such action was *Plechner v. Widener College, Inc.*, 418 F.Supp. 1282 (E.D.Pa.1976), *aff'd*, 569 F.2d 1250 (3rd Cir. 1977). That suit was brought to set aside the affiliation of Delaware Law School with Widener College. On January 24, 1976, Avins moved to intervene and filed a complaint as an intervenor, alleging that he was "a citizen and resident of Delaware," the defendants were citizens of other states, "[j]urisdiction of the original action is founded pursuant to 28 U.S.C. sec. 1332, and pendent jurisdiction of state claims, and jurisdiction existed when plaintiff Avins intervened." Complaint of Plaintiff Avins, Intervenor, at 1. That litigation was terminated upon the entry of judgment for defendants after a bench trial conducted by the Honorable Edward R. Becker of this Court.

The second case in which Avins was a party was *Avins v. White*, No. 346–1976 (Del.Super.Ct., filed March 18, 1976). This matter concerned Avins' claim that he had been defamed by Professor James P. White during an accreditation review of Delaware Law School by an evaluation team from the ABA. In his complaint, Avins stated that "[p]laintiff is a resident of the State of Delaware" and "[d]efendant is not a resident of the State of Delaware." Complaint, at 1. On April 7, 1976, defendant White filed a petition to remove the action to the United States District Court for the District of Delaware, in which he stated that this action could have been brought in federal district court pursuant to 28 U.S.C. § 1332, and it was therefore removable to federal court by 28 U.S.C. § 1441. Avins did not object to the removal of this action to federal district court, where it was tried before the Honorable Walter K. Stapleton. The jury returned its verdict on September 26, 1978, and its award of $50,000 in damages for Avins' alleged defamation was recently reversed and remanded for a new trial. *Avins v. White*, 627 F.2d 637 (3rd Cir. 1980).

Another case brought by the plaintiff arising from the affiliation of DLS and Widener was *Avins v. Widener College, Inc.*, No. 76–222 (D.Del., filed July 8, 1976). In that matter, plaintiff alleged that he "has his residence at 1908 Washington Street, Wilmington, Delaware," defendant

Widener was a corporation organized under the laws of Pennsylvania, and "[t]his Court has jurisdiction of this action by virtue of 28 U.S.C. sec. 1332." Consolidated Amended Complaint, at 1. That case was tried before the Honorable James L. Latchum in the summer of 1979 and the jury returned a verdict of no cause for action on July 26, 1979.

In addition to his participation in the above–listed cases, Avins has also been named as a defendant in an action arising from the accreditation process for DLS. A complaint for libel was filed against him by the Honorable G. Fred DiBona, Judge of the Court of Common Pleas of Philadelphia County, Pennsylvania, in the United States District Court for the Eastern District of Pennsylvania, *DiBona v. Avins*, No. 78–3057 (E.D.Pa., filed September 12, 1978). Judge DiBona alleged in his complaint that Avins "is a citizen of the State of Delaware residing at 1908 Washington Street in the City of Wilmington." Complaint, at 1. Avins failed to deny this assertion when he filed his answer to DiBona's complaint, thereby admitting the allegation. Fed.R.Civ.P. 8(d).

Plaintiff has attempted to explain his prior allegations of Delaware citizenship by asserting that he was compelled by Delaware Law School's residence policy to claim Delaware citizenship, even though he contends that he continued to be a citizen of New York when he filed the pleadings. He refers to a resolution adopted by the DLS Board of Trustees on February 7, 1976, which provided in pertinent part:

no full–time faculty person will be employed or retained in employment as a full–time member of the faculty whose place of residence (domicile) and that of his immediate family is not within a radius of forty (40) miles from the location of Delaware Law School. It is understood, however, that some deviation from this rule may be made during the first year of employment. Under extraordinary circumstances this may be extended as much as one semester beyond the first year.

Plaintiff contends that this requirement was adopted for the purpose of providing a pretext for his dismissal unless he ceased to contend that he was a New York domiciliary. He explained:

It is true . . . I have a modicum of legal training and understood if I pleaded I was a citizen of New York it would be used in disciplinary proceedings following as soon as they could reasonably get to it. So I was in effect compelled to adopt Delaware citizenship.

Tr., at 11. Based upon this explanation, plaintiff asks this court to ignore his prior pleadings and to declare that he was a citizen of the State of New York until he became a citizen of the District of Columbia.

Counsel for defendants explored this argument in his cross–examination of plaintiff, wherein the following exchange took place:

Q And you said that the reason you filed several pleadings in which you alleged that you were a resident and domiciliary of the State of Delaware was because what? You said it wasn't true when you filed those pleadings?

A I said I was compelled to be a citizen of Delaware by the action of the new administration of Widener College.

Q You were lying, is that right?

A No.

Q You filed false pleadings?

A No.

Q Did you believe the pleadings you filed when you said I reside in Delaware?

A I did have a residence in Delaware and a residence in New York. So therefore both were true.

Q Was it a true full and correct statement that you put in these pleadings when you alleged you were a resident and citizen of Delaware?

A I was compelled to be a citizen of Delaware.

Q I'm only asking, was the pleading true or not?

Tr., at 25–26. To which plaintiff finally answered

I supposed that one–I don't know, I guess it's a legal question. I suppose the Fourteenth Amendment provides all persons born or naturalized in the United States are citizens of the United States and the state in which they reside. I suppose one could be compelled to reside in a particular state and thereby be a citizen. If that's the case, one can be a citizen of more than one state at the same time because one could have more than one residence. So under the Fourteenth Amendment, one could be a citizen of several states at the same time. People have dual citizenships between let's say the United States and Italy or some other foreign country. I suppose one could have dual citizenship of several states. I don't know.

Tr., at 27–28. Counsel for the defendants also argued that the resolution in question was adopted by the DLS Board of Trustees in response to critical comments made by various ABA inspection teams about the use of "commuters" as full–time faculty members, not to provide an excuse to dismiss Avins from his position at DLS.

After carefully considering the arguments of both sides, the court must agree with the interpretation offered by defendants. There is simply no indication that this resolution was adopted for the purpose of providing a basis for disciplinary action against the plaintiff. Moreover, both the minutes of the trustee meeting and the text of the resolution refer to the prior criticism of DLS for using faculty members who commuted to the school from considerable distances and stayed in the area for only part of each working week.

█ The court also notes that plaintiff's position suffers from some more fundamental flaws. First of all, plaintiff contends that under the terms of the fourteenth amendment he may be considered a citizen of more than one state for the purpose of invoking the court's jurisdiction since he had a residence in more than one state. This argument must necessarily fail. The Supreme Court has clearly stated that a person may only be a citizen of one state.

As Mr. Justice Holmes observed in *Williamson v. Osenton*, 232 U.S. 619, 625, 34 S.Ct. 442, 443, 58 L.Ed. 758 (1914):

> The very meaning of domicil is the technically pre–eminent headquarters that every person is compelled to have in order that certain rights and duties that have been attached to it by the law may be determined. . . . In its nature it is one; and if in any case two are recognized for different purposes, it is a doubtful anomaly.

Furthermore, the Supreme Court has also expressly rejected the assertion that the fourteenth amendment authorizes an individual to invoke the court's jurisdiction based upon diversity of *residences* of the parties when there has been no showing of diversity of *citizenship*. *Robertson v. Cease*, 97 U.S. 646, 650, 24 L.Ed. 1057 (1878); *Woolridge v. McKenna*, 8 F. 650, 684 (C.C.W.D.Tenn.1881). Even if the court did accept plaintiff's novel theory that he was a citizen of both New York and Delaware at the relevant time, it would still be deprived of jurisdiction to hear plaintiff's state claims because his Delaware citizenship would destroy the requisite complete diversity of citizenship between the parties. *Strawbridge v. Curtiss, supra*; cf. 28 U.S.C. § 1332(c).

█ Finally, the court concludes that plaintiff's recurring and conflicting assertions of New York, Delaware, District of Columbia, and possibly New Hampshire citizenship, indicate that his shifting desires to invoke the jurisdiction of various courts have affected his declarations and other manifestations of his citizenship. The court's review of plaintiff's statements and actions leads to the inescapable conclusion that Avins claimed he was a resident and citizen of Delaware when it suited his purposes but abandoned those assertions and sought to explain away his prior words and deeds when it was no longer expedient for him to be considered a citizen of that state. No court committed to the fair delivery of justice to all concerned can tolerate this sort of manipulation of its jurisdiction by any person, least of all by an individual who

has devoted his life to the study of the law and the instruction of the next generation of lawyers and scholars. Consequently, the court shall hold the plaintiff to his earlier declarations of Delaware citizenship and shall not now permit him to circumvent the consequences of his Delaware citizenship. The court emphasizes, however, that this is only one of many considerations which has influenced its decision and that, in its judgment, the other factors standing alone are sufficient to merit the conclusion that plaintiff was a citizen of the State of Delaware at the time he filed this action.

## II. Pendent Jurisdiction

Since the court has concluded that it may not exercise jurisdiction over plaintiff's state law claims based upon diversity of citizenship, it must dismiss these claims unless it determines that this is a proper case for the exercise of pendent jurisdiction. Plaintiff contends that pendent jurisdiction is vested in the court by the federal questions raised by his two new federal claims. Defendants challenged plaintiff's assertion of pendent jurisdiction, arguing that the federal claims do not constitute a sufficient basis for the application of pendent jurisdiction and that it would be an abuse of discretion to exercise pendent jurisdiction in this case. Defendants, in effect, ask this court to dismiss the new federal counts for failure to state an actionable claim.[10] Because the dismissal of the remaining federal claims would normally mandate the dismissal of any pendent claims, *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), the court must consider defendants' challenge to the federal claims before addressing the question of pendent jurisdiction.[11]

Plaintiff's first federal claim contains the following allegations:

**10.** See note 4, *supra.*

**11.** Although the Supreme Court declared in *United Mine Workers v. Gibbs, supra,* at 726, 86 S.Ct. at 1139, that "if the federal claims are dismissed before trial . . . the state claims should be dismissed as well," this has not been construed as an absolute bar to the

Defendants, through their agents, against plaintiff's protests, circulated a letter petitioning a federal official written by plaintiff on November 5, 1979, during 1975–76, and again during 1976–77, and finally during Spring 1978, and during Fall 1976, Spring 1977, and again during Spring 1978, used this letter as a "charge" in an attempt to obtain plaintiff's dismissal from his employment as a reprisal for plaintiff's having petitioned said federal official, thereby violating plaintiff's right of petition under the Privileges and Immunities Clause of Art. 4, Sec. 2, U.S. Constitution, whereby plaintiff demands $50,000 in compensatory damages and $100,000 as punitive damages.

Plaintiff's Amended Complaint, at 14.

The consideration of this claim should begin with an examination of the applicable constitutional provisions. The section cited by the plaintiff in his complaint is the guarantee of privileges and immunities of the citizens of a state. It provides, "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S.Const., Art. IV, § 2. A second reference to "privileges and immunities" is to be found in the fourteenth amendment, which states, "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S.Const., Amend. XIV, § 1. The difference between Article IV's guarantee of the privileges and immunities of *state* citizenship and the fourteenth amendment's guarantee of the privileges and immunities of *United States* citizenship was examined by the Supreme Court in *Slaughter–House Cases*, 83 U.S. (16 Wall.) 36, 74–80, 21 L.Ed. 394 (1873). In that famous decision, Mr. Justice Miller reviewed the prior cases construing the guarantee of the privileges and immunities of

consideration of any pendent state claims. There have been several cases "in which state claims have been retained and decided even though the federal claim was dismissed before trial." 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3567, at 452 & n. 35 (1975 and Supp.1980).

state citizenship, quoting with approval the description provided by Mr. Justice Washington in *Corfield v. Coryell*, 6 F.Cas. 546, 551–52 (C.C.E.D.Pa.1823) (No. 3,230):

"We feel no hesitation in confining these expressions to those privileges and immunities which are *fundamental*; which belong of right to the citizens of all free governments, and which have at all times been enjoyed by citizens of the several States which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are, it would be more tedious than difficult to enumerate. They may all, however, be comprehended under the following general heads: protection by the government, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restraints as the government may prescribe for the general good of the whole."

*Slaughter–House Cases, supra*, at 76, 21 L.Ed. 394. Mr. Justice Miller went on to describe the unique nature of this guarantee:

In the case of *Paul v. Virginia*, [75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1868)] the court, in expounding this clause of the Constitution, says that "the privileges and immunities secured to citizens of each State in the several States, by the provision in question, are those privileges and immunities which are common to the citizens in the latter States under their constitution and laws by virtue of their being citizens."

The constitutional provision there alluded to did not create those rights, which it called privileges and immunities of citizens of the States. It threw around them in that clause no security for the citizen of the State in which they were claimed or exercised. Nor did it profess to control the power of the State governments over the rights of its own citizens.

Its sole purpose was to declare to the several States, that whatever those rights, as you grant or establish them to your own citizens, or as you limit or qualify, or impose restrictions on their exercise, the same, neither more nor less, shall be the measure of the rights of citizens of other States within your jurisdiction.

*Id.*, at 76–77, 21 L.Ed. 394. The court in *Slaughter–House Cases, supra*, then contrasted this with the rights conferred by the fourteenth amendment's guarantee of the privileges of United States citizenship. One of the rights of United States citizenship discussed in that decision is analogous to the right to petition mentioned in the plaintiff's complaint. The court described this as

the right of the citizen of this great country, protected by implied guarantees of its Constitution, "to come to the seat of government to assert any claim he may have upon that government, to transact any business he may have with it, to seek its protection, to share its offices, to engage in administering its functions."

*Id.*, at 79, 21 L.Ed. 394, *quoting Crandall v. Nevada*, 73 U.S. (6 Wall.) 35 (1867). The characterization of the right to petition as a right of *United States* citizenship secured by the fourteenth amendment privileges and immunities clause instead of a right of *state* citizenship secured by Article IV was affirmed by the Supreme Court in *Twining v. New Jersey*, 211 U.S. 78, 97, 29 S.Ct. 14, 18, 53 L.Ed. 97 (1908). Based upon the foregoing analysis, plaintiff's claim may only arise under the fourteenth amendment guarantee.

 Even if the court liberally construed plaintiff's complaint to allege a violation of his rights under the fourteenth amendment guarantee of the privileges and immunities of United States citizenship, it could not sustain his claim. The fourteenth amendment's guarantee only prevents a *state* from establishing or enforcing a law which abridges the privileges and immunities of federal citizenship. It says nothing about the actions of private individuals who are not agents of the state. Consequently, unless the plaintiff can establish that there was some state action, he cannot sustain his claim for the alleged violation of his rights. *The Civil Rights Cases*, 109 U.S. 3, 11, 3

S.Ct. 18, 21, 27 L.Ed. 835 (1883). Since none of the defendants in this case are state authorities or state agents, the court must dismiss with prejudice plaintiff's claim for the alleged violation of his right to petition.

Plaintiff's other federal claim involves alleged violations of the federal antitrust laws. It provides:

> The aforesaid acts stated in causes of action nos. 1–21 were done by defendants in combination pursuant to a plan to eliminate and "blackball" plaintiff from legal education in the Delaware–Pennsylvania–New Jersey area and to injure the plaintiff's property rights and to restrict competition from plaintiff in legal education, all in violation of 15 U.S.C. secs. 1–3, whereby this Court has jurisdiction pursuant to 15 U.S.C. sec. 15, for which plaintiff demands treble damages, as provided by law.

Plaintiff's Amended Complaint, at 17. Defendants have challenged the legal sufficiency of this claim, arguing that plaintiff is trying to convert his claims of alleged tortious conduct into federal antitrust claims by simply alleging that the defendants' actions also served to restrict competition from him. Defendants contend, citing the case of *Franklin Music Company v. American Broadcasting Companies, Inc.,* 616 F.2d 528 (3rd Cir. 1979), that the court can only recognize a Sherman Act claim if the plaintiff shows that the alleged acts constituted a combination or conspiracy which had a general impact on competition, not just on the ability of one particular individual to compete.

The court has reviewed the opinion in *Franklin Music Company, supra,* and notes that it does mandate that "a civil conspiracy for a purpose unlawful under Pennsylvania law must be accompanied by proof of an effect upon competition in a defined market in order to make out a prima facie violation of section 1 of the Sherman Act." *Id.,* at 542. However, defendants failed to point out that the court was discussing what evidence needs to be presented by the plaintiff to defeat a motion for a directed verdict at the close of the plaintiff's case, Fed.R.Civ.P. 50(a), not what the plaintiff must allege to defeat defendants' motion to dismiss his claim before it is presented to the jury. In the latter situation, the plaintiff must be permitted to present his claim at trial unless, construing the plaintiff's claim in a light most favorable to him, the court finds that it does not state an actionable grievance. Viewing the plaintiff's antitrust count in this light, the court is unable to say that it cannot be construed to allege a colorable claim under the Sherman Act. Consequently, defendants' motion to dismiss plaintiff's antitrust claim must be denied.

Having concluded that one of plaintiff's federal claims may not be dismissed at this time, the court must now determine whether it should also exercise pendent jurisdiction over the plaintiff's state law claims.

The principles governing pendent jurisdiction over state law claims were set out in the Supreme Court's opinion in *United Mine Workers v. Gibbs, supra.* In that decision the Supreme Court explained that the district court must perform a two step analysis before it asserts pendent jurisdiction over state law matters. First, the district court must determine whether it has the *power* to hear the state claims as part of a single case involving one or more federal claims as well. *Id.,* 383 U.S. at 725, 86 S.Ct. at 1138. In making this determination, it must consider whether the federal claim has "substance sufficient to confer subject matter jurisdiction on the court." *Id.* The court must also find that the state and federal claims "derive from a common nucleus of operative fact" and that the "plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding" when viewed "without regard to their federal or state character." *Id.* Second, if the court finds that all of the above-mentioned requirements have been met, it must then decide whether to *exercise* that judicial power in a given case. In making that determination, it should note that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Id.,* at 726, 86 S.Ct. at 1139; *Mayor of Philadelphia*

v. *Educational Equality League*, 415 U.S. 605, 627, 94 S.Ct. 1323, 1336, 39 L.Ed.2d 630 (1974). Here the court must consider matters of "economy, convenience and fairness to the litigants." *United Mine Workers v. Gibbs, supra*, 383 U.S. at 726, 86 S.Ct. at 1139. It should be guided by a commitment to avoid "[n]eedless decisions of state law . . . both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Id.* The district court may also dismiss plaintiff's state law claims without prejudice to their assertion in the appropriate tribunal "if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought," *id.*, or if the inclusion of the state law claims could unduly complicate the case and confuse the jury. *Moor v. County of Alameda*, 411 U.S. 693, 716–17, 93 S.Ct. 1785, 1799–800, 36 L.Ed.2d 596 (1973).

The court shall now apply this two step test to the plaintiff's complaint.

■ First, the court considers the question of its power to hear plaintiff's state law claims. Defendants have argued that plaintiff's federal claims are not substantial enough to establish the court's pendent jurisdiction. However, the cases clearly establish that substantiality is determined on the face of the pleadings, not upon the evidence which will ultimately be introduced at trial. *Tully v. Mott Supermarkets, Inc.*, 337 F.Supp. 834, 844 (D.N.J.1972); *Hirsch v. du Pont*, 396 F.Supp. 1214, 1229 (S.D.N.Y. 1975), *aff'd*, 553 F.2d 750 (2nd Cir. 1977). As the court stated in *In re Union National Bank and Trust Company*, 298 F.Supp. 422, 424 (E.D.Pa.1969):

Federal claims have satisfied the substantiality requirement for pendent jurisdiction purposes where it could not be dismissed on the face of the pleadings alone. See, *Rumbaugh v. Winifrede Railroad Co.*, 331 F.2d 530 (4th Cir. 1964), cert. denied, 379 U.S. 929, 85 S.Ct. 322, 13 L.Ed.2d 341. So long as the federal claim is not clearly unsound or obviously without merit, it is sufficient to confer jurisdiction on the Federal Court even over the non-federal claim.

Consequently, the court must reject defendants' argument that plaintiff's antitrust claim is not substantial enough to give rise to pendent jurisdiction over the state law claims. However, this does not end the first stage of the pendent jurisdiction analysis since the court must also determine whether the plaintiff's federal and state claims were derived from the common nucleus of operative fact and whether the plaintiff would ordinarily expect to try them together in one proceeding.

■ Plaintiff may argue that the federal and state claims satisfy these requirements, since the antitrust claim incorporates all of the factual allegations presented in his other claims and since both the federal and state claims arose from the same series of events. However, there are at least two flaws with this line of reasoning. First, plaintiff could have spelled out the specific factual allegations which gave rise to his antitrust claim instead of simply incorporating all of his prior assertions. If he had taken the former approach, it would have demonstrated that the issues presented by his antitrust claim constitute only a small subset of the issues raised by his state law claims. Moreover, his antitrust claim will inevitably generate factual and legal issues, such as the determination of the relevant market, the impact of the defendants' alleged actions upon the competitive conditions in that market, and various other issues, which are not involved in his state law claims. The fact that plaintiff elected to take the latter approach and reincorporate all of his prior factual claims cannot disguise the differences between the issues presented by his federal and state claims. Second, even if the court took a broad perspective on the plaintiff's state and federal claims and agreed that they are derived from the same event, they will not have met the common nucleus of fact requirement since they involve different elements of proof and theories of recovery. *Wilder v. Irvin*, 423 F.Supp. 639, 642–43 (N.D.Ga.

1976). Accordingly, the court must conclude that the plaintiff has not satisfied the first step of the pendent jurisdiction test.

Even if the court concluded that it had the power to hear plaintiff's state law claims, it believes that it would be best if, in the exercise of its discretion, it dismissed these claims without prejudice to their assertion in a proper forum. This decision is a product of several considerations. First, the court would be compelled to resolve a multitude of state law issues if it heard plaintiff's state claims. While a federal district court is expected to rule upon questions of state law when exercising its diversity jurisdiction, it should avoid such decisions whenever possible. *United Mine Workers v. Gibbs, supra,* 383 U.S. at 726 & n.15, 86 S.Ct. at 1139 & n.15. Second, this is a case where state issues are clearly predominant. The state claims raise a diverse collection of non–federal issues on subjects ranging from contracts and corporation law to defamation and fraud. Moreover, his state claims would involve more extensive remedies, including specific performance of an alleged agreement to name the DLS law library in his honor, as well as assorted demands for compensatory and punitive damages for various contract and tort claims. In contrast, plaintiff's antitrust claim concerns only one area of law and asks for only one remedy, an award of treble damages. Finally, the court believes that this is a case in which the federal claim "is not the major issue, but is rather appended to give this court jurisdiction." *Winterhalter v. Three Rivers Motors Company,* 312 F.Supp. 962, 963 (W.D.Pa.1970). Based upon all of these considerations, the court concludes that even if it had the power to hear plaintiff's state law claims, it should exercise its discretionary right to dismiss the state claims in this case. Accordingly, the court shall dismiss plaintiff's state law claims without prejudice to their assertion in an appropriate forum.

To sum up, the court holds that it may not exercise diversity jurisdiction in this case, the plaintiff's privileges and immunities claim should be dismissed with prejudice, and the plaintiff's remaining state law claims should be dismissed without prejudice.